ORIGINAL

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

JUL - 3 2002

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

| | |
|---|---|
| Alvertis Isbell d/b/a Alvert Music | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DM Records, Inc, | ) |
| | ) |
| Defendant. | ) |

3 - 0 2 C V 1 4 0 8 - G

Civil Action No. _____

---

## COMPLAINT

---

1.      COMES NOW Plaintiff Alvertis Isbell d/b/a Alvert Music ("Alvert Music") by its attorneys, files this Complaint against DM Records, Inc. ("DM"), and alleges as follows:

### I.

### NATURE OF THE ACTION

2.      This action for declaratory relief and damages is brought by Alvert Music, pursuant to the Copyright Revision Act, 17 U.S.C. §§ 101, et seq. (the "Copyright Act") and 28 U.S.C. § 220 and Tex. Prac. Civ. & Rem. Code §§ 37.001, et seq. The Complaint arises out of willful actions by DM which violate Alvert Music's exclusive rights in certain musical compositions, granted under 17 U.S.C. § 106.

3.      Alvert Music is the owner, in whole or in part, of the right, title, and interest in and to numerous musical compositions, including the copyrights therein, together with the right to register the statutory copyrights therein. Alvert Music complied with all of the laws pertinent to these compositions as copyrighted works, and the subject copyright registrations have been

appropriately deposited and/or registered with the U.S. Copyright office. At all pertinent times hereto, Alvert Music has complied with all applicable provisions of the copyright laws of the United States of America.

4.     DM has unlawfully exploited the copyrights in certain of Alvert Music's compositions (the "Alvert Compositions") by (1) holding itself out as the lawful owner of the Alvert Compositions; (2) releasing the Alvert Compositions on DM sound recordings and receiving all revenue therefrom; and (3) licensing the Alvert Compositions to various entertainment entities and receiving the revenue generated therefrom. As redress for such improper and unlawful actions, Alvert Music seeks: (1) declaratory judgment that it owns the musical composition copyrights in the Alvert Compositions; and (2) recovery of money damages resulting from the infringements by DM; and (3) all attorneys' fees and costs associated with the bringing of this action.

## II.

## PARTIES

5.     Plaintiff Alvertis Isbell, doing business as Alvert Music, is a citizen of the State of Arkansas and resides at 5508 Belle Pointe Road, North Little Rock, Arkansas, 72022. At all relevant times, Alvert Music was (and continues to be) engaged in, among other things, the business of music publishing and otherwise commercially exploiting musical composition copyrights.

6.     DM Records is a Florida corporation and may be served with process at 1791 Blount Road, Suite 712, Pompano Beach, Florida 33069. At all relevant times, DM Records has (and continues to be) engaged in, among other things, the business of a record company, commercially exploiting sound recording copyrights, some of which DM owns and some of

2

which it licenses.

## III.

### SUBJECT MATTER JURISDICTION AND PERSONAL JURISDICTION

7.     The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1338(a) in that

the controversy arises under the Copyright Act, which is within the exclusive jurisdiction of

federal courts pursuant to 28 U.S.C. § 1367. Additionally, pursuant to 28 U.S.C. § 1367, this

Court has jurisdiction over plaintiff's claims under the Federal Declaratory Judgment Act, 28

U.S.C. § 220. Further, jurisdiction in this Court is proper as the matter in controversy exceeds

seventy-five thousand dollars ($75,000) and both parties are citizens of different states.  28

U.S.C. §§ 1332(a), (c)(1) and (d).

8.     Personal jurisdiction over DM is proper in this jurisdiction, among other reasons,

on the grounds that DM, DM's agents, and/or DM's personal representatives: (A) purposefully

availed itself of the privilege of conducting activities in the State of Texas, thus invoking the

benefit and protection of its laws, by marketing, distributing, selling, and/or licensing DM's

sound recordings of the Alvert Compositions in Texas, including conducting such business

through performing rights organizations, which perform services on behalf of DM in the State of

Texas and by entering into contracts that are consummated and/or performed in Texas, including

the contract to purchase the assets of Isbell Records, Inc. d/b/a Bellmark Records ("Bellmark");

and/or (B) acting directly or indirectly,  conducted a sustained pattern of business in Texas; (C)

contracted to supply services or things in Texas, including sound recordings of the Alvert

Compositions; and/or (D) through an act or omission, committed a tort in whole or in part in

Texas.  Specifically, DM purposefully availed itself of the benefits of conducting activities in

Texas by entering into contracts to purchase sound recordings and other assets in Texas,

3

directing the distribution of the sound recordings containing the Alvert Compositions and numerous others into Texas, selling said recordings and others in Texas via various media including retail outlets and the Internet and receiving revenue based upon the sales and performance of such recordings and compositions in Texas.   Service of process on DM is pursuant to the Texas long-arm statute, Tex. Civ. Prac. & Rem. Code § 17.042 (2002).

### IV.

### VENUE

9.      Venue is proper in this District pursuant to 28 U.S.C. §§1391 and 1400(a) because a substantial part of the events or omissions giving rise to Alvert Music's claims occurred herein. Specifically, DM purchased sound recordings and other assets of Bellmark in the Dallas County, Texas, improperly licensed the Alvert Compositions for use in Dallas County, Texas and received revenue based upon the performances and/or sales arising from such improper uses in Dallas County, Texas.

### V.

### FACTUAL BACKGROUND

10.      In all times during its existence, Bellmark was exclusively a record company, i.e., it owned and exploited sound recordings.   Bellmark never owned or exploited musical compositions.  The president and CEO of Bellmark was Alvertis Isbell.

11.      Alvertis Isbell d/b/a Alvert Music, at all times, has been exclusively a music publishing company, i.e., it owns and exploits musical compositions, not sound recordings.

12.      At all times during Bellmark's existence, Alvert Music was Bellmark's affiliated publishing company or affiliated designee publisher, meaning that, while Bellmark owned the

4

*sound recordings* of the songs it exploited, to the extent it could be negotiated, Alvert Music owned the *composition copyrights* in those songs.

13.    In July, 1992, Bellmark entered into a co-venture with Anthony Johnson and B.T.J. Inc., d/b/a Tony Mercedes Records ("TMR"), whereby the entities would share responsibility for the manufacture, marketing and distribution of certain recordings (the "TMR/Bellmark Agreement"). Pursuant to the terms of the TMR/Bellmark Agreement, Bellmark's **"affiliated publishing company"** obtained a publisher's interest (i.e., ownership of the copyright) in the compositions recorded thereunder, including the composition "Daizzey Duks," written and performed by the artist "Duice." See TMR/Bellmark Agreement attached hereto as Exhibit A (emphasis added). At all times during Bellmark's existence, Alvert Music was its affiliated publishing company. Hence, upon execution of the TMR/Bellmark Agreement, the publisher's interest in the composition copyright of "Daizzey Duks" passed immediately and directly to Alvert Music. It, by the terms of the agreement, was never an asset of Bellmark.

14.    Cecil Glenn a/k/a "D.C." and Steve Gibson, individually and collectively d/b/a "Tag Team," (collectively referred to, hereinafter, as "Tag Team") were songwriters and recording artists in the rap/hip-hop/urban genre. In March, 1993, Tag Team agreed to contract with Bellmark concerning various sound recordings, compositions and performances created by Tag Team, through an Exclusive Producers Agreement with Bellmark Records (the "Tag Team/Bellmark Agreement," attached hereto as Exhibit B). As part of this Agreement, Tag Team "convey[ed] . . . fifty percent 50% interest in and to [the] publisher's share" of the compositions recorded under the Tag Team/Bellmark Ágreement to "Bellmark's **affiliated designee publisher, its successors and assigns.**" Ex. B, ¶ 18(e) and Exhibit B thereto (emphasis added). This assignment included the incredibly popular composition "Whoomp!

(There It Is)." At all times during Bellmark's existence, Alvert Music was its affiliated designee publisher. Hence, upon execution of the Tag Team/Bellmark Agreement, the publisher's interest in the composition copyright to "Whoomp! (There It Is)," as well as the other Tag Team compositions incorporated by the Tag Team/Bellmark Agreement, passed immediately and directly to Alvert Music and such composition copyrights were never an asset of Bellmark.

15.     DM Records is engaged in, among other things, the business of selling sound recordings. In 1997, DM apparently desired to release Tag Team's works, specifically the sound recording "Whoomp! (There It Is)", as well as Duice's works, specifically "Daizzey Duks." In an effort to obtain the appropriate permission to release the Tag Team recording, DM signed a mechanical license with Alvert Music (not Bellmark) whereby Alvert Music granted DM permission to include the above-listed "Whoomp (There It Is)" on a DM sound recording in return for DM's payment of mechanical royalties to Alvert Music. Moreover, DM signed a mechanical license with Alvert Music (not Bellmark) whereby Alvert Music granted DM permission to include "Daizzey Duks" on a DM sound recording in return for DM's payment of mechanical royalties to Alvert Music. Ex. C. In furtherance of such mechanical licenses, DM paid to Alvert Music mechanical royalties for such uses of "Whoomp! (There It Is)" and "Daizzey Dukes," as evidenced by royalty statements from DM to Alvert Music. Ex. D. Exhibits C and D demonstrate that, as early as 1997, DM was aware that Bellmark Records owned the Tag Team *sound recordings* and Alvert Music – a different legal entity, "the affiliated publishing designee" of Bellmark owned the Tag Team and Duice *compositions*.

16.     The appropriate licenses were executed and DM began to exploit the various Tag Team and Duice sound recordings and musical compositions.

17.     On or about April 18, 1997, Bellmark filed a voluntary petition for relief under Chapter 11, Title 11 of the United States Bankruptcy Code (Case No. 97-41243-DRS, Eastern District of Texas, Sherman Division).  The Chapter 11 bankruptcy was converted to a Chapter 7 bankruptcy on or about January 7, 1998.  The Trustee in the bankruptcy proceeding was Mark A. Weisbart, an attorney practicing at Kessler & Collins in Dallas, Texas.  At no time did Alvertis Isbell and/or Alvert Music file for bankruptcy protection.  At no time were Alvertis Isbell and/or Alvert Music determined to be alter egos of Bellmark.  At no time has the corporate veil of Bellmark been pierced to allow access to Alvertis Isbell.  In sum, Alvertis Isbell, individually and d/b/a Alvert Music, was not a subject of the Bellmark bankruptcy.

18.     On or about October 4, 1999, DM consummated a purchase of the assets of Bellmark with Trustee Weisbart.  Through this purchase, DM became the owner of various compilations, albums and individual song *sound recordings*.

19.     Bellmark never owned any musical compositions, only sound recordings. Consequently, the musical composition copyrights in the Alvert Compositions, which were not involved in the bankruptcy, could not be and, indeed, were not sold to DM through DM's purchase of Bellmark's assets.  At all times, the Alvert Compositions remained in the ownership of Alvert Music.

20.     At some point following DM's purchase of Bellmark's sound recordings, DM began claiming ownership in certain of the Alvert Compositions, including "Whoomp! (There It Is)" and "Daizzey Duks."  It appears that, DM has taken the position that it purchased the Alvert Compositions in the purchase transaction involving the assets of Bellmark.

21.     Since the Bellmark bankruptcy sale, DM has exploited the sound recordings embodying the Alvert Compositions without paying mechanical or other royalties to Alvert

Music, and without recognizing Alvert Music's ownership of the Alvert Compositions contained therein.

22.     Additionally, DM has taken action at the performing rights organization Broadcast Music Incorporated ("BMI") to claim ownership of the musical compositions "Whoomp (There It Is)," "Miracle Worker," "Funky Situation," "Audio Entertainment," "Daizzey Duks," "Bow Wow," and "You Make Me Wanna Dance," and to instruct BMI to divert to DM performance royalties, which should be paid to Alvert Music.

23.     Upon information and belief, soon after October 4, 1999 and continuing to the present, DM has infringed the copyrights in the Alvert Compositions, specifically "Whoomp! (There It Is)" and "Daizzey Duks," via the above-listed actions and exploitations, and has continually misrepresented that it has the right to license the manufacture, distribution, sale and/or public performance of the Alvert Compositions in any form.  Further, DM has reaped the financial rewards of such infringement without making any payment to Alvert Music.

24.     Since 1997, DM has been on notice of Alvert Music's ownership of the Alvert Compositions and has failed and refused to take any corrective and proper action to remedy its infringement.

25.     As demonstrated in paragraph 15 herein and as evidenced by DM's previous dealings with Alvert Music as owner of the Alvert Compositions, DM's infringement has been and continues to be willful and knowing.  More specifically, DM knew that Alvert Music, and not Bellmark Records, was the rightful owner of the Alvert Compositions, including "Whoomp! (There It Is)" and "Daizzey Dukes," that the Alvert Compositions, therefore, could not be purchased through the Bellmark bankruptcy and, hence, that DM had no legal claim of any kind in the Alvert Compositions.  Despite such knowledge, DM nonetheless acted as owner of the

Alvert Compositions and exploited the Alvert Compositions.  In the alternative, DM's conduct, even if not willful and knowing, constitutes infringement of Alvert Music's copyrights.

26.     As a direct and proximate result of DM's conduct, Alvert Music has suffered actual damages including lost profits, lost opportunities, loss of goodwill, lost publicity, attorney's fees and interest, and, in the alternative, are entitled to statutory damages as allowed by law.

**COUNT 1**

**ACTION FOR DECLARATORY JUDGMENT OF ALVERT MUSIC'S OWNERSHIP OF CLAIMED COPYRIGHTS IN THE ALVERT COMPOSITIONS**

27.     Alvert Music repeats and realleges each and every allegation set forth in paragraphs 1 through 26 hereof as if fully set forth herein.

28.     Pursuant to 17 U.S.C. §101 et seq., 28 U.S.C. § 220 and Tex. Prac. Civ. & Rem. Code §§ 37.001, et seq., this Court may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

29.     Alvert Music seeks a declaratory judgment that Alvert Music is the rightful owner of the Alvert Compositions, on the grounds that Alvert Music is a separate entity from Bellmark and was never at any time involved in the Bellmark bankruptcy and, hence, DM's copyright interests, obtained from the purchase of the assets from Bellmark, was limited only to the sound recording copyrights contained therein and did not include any other interest in the copyrights in the Alvert Compositions.

30.     Alvert Music further seeks declaratory judgment that, as a result of its ownership referenced above, any and all assignments and/or transfers and/or licenses of the subject infringing copyright are hereby declared null and void.

31.     Alvert Music additionally seeks its costs and attorney's fees in bringing this action.

## COUNT 2

### COPYRIGHT INFRINGEMENT ARISING OUT OF THE UNAUTHORIZED LICENSING AND USE OF "WHOOMP! (THERE IT IS)"

32.     Alvert Music repeats and realleges each and every allegation set forth in paragraphs 1 through 31 hereof as if fully set forth herein.

33.     Tag Team wrote a musical composition entitled "Whoomp! (There It Is)," and, pursuant to the terms of the Tag Team/Bellmark Agreement, granted 50% of the publisher's share of such composition exclusively to Alvert Music. Ex. B.

34.     At some point following the purchase of assets from Bellmark, DM, claiming ownership of publishing rights in the Alvert Compositions and specifically "Whoomp! (There It Is)", began administering the rights to record, reproduce and distribute the musical composition "Whoomp! (There It Is)" in violation of Alvert Music's exclusive rights enumerated in 17 U.S.C. § 106. Specifically, DM issued mechanical licenses, synchronization licenses and/or other licenses authorizing digital phonorecord delivery and "streaming" via the Internet for "Whoomp! (There It Is)".\ Additionally, DM took action at the performing rights organization BMI to claim ownership of the Alvert Compositions and to instruct BMI to divert performance royalties which should be paid to Alvert Music in violation of Alvert Music's right of performance under 17 U.S.C. 106(4).

10

35.     DM Records improperly received fees and royalties generated by "Whoomp! (There It Is)", including mechanical royalties, performance royalties, synchronization royalties, digital phonorecord delivery royalties and royalties associated with "streaming" music perceived via the Internet.

36.     Alvert Music has received no compensation from DM in the form of royalties and/or other fees associated with DM's improper authorizing and licensing the use of "Whoomp! (There It Is)", and, to date, the infringements have not been remedied, as DM continues to operate under existing infringing licenses and generate new infringing licenses in direct violation of Alvert Music's rights under 17 U.S.C. § 106.  Further, DM continues to hold itself out as the rightful owner of the Alvert Compositions, including "Whoomp! (There It Is)."

37.     DM engaged in the conduct detailed in the foregoing with knowledge of Alvert Music's ownership in the musical composition "Whoomp! (There It Is)."

## COUNT 3

### COPYRIGHT INFRINGEMENT ARISING OUT OF THE UNAUTHORIZED LICENSING AND USE OF "DAIZZEY DUKS"

38.     Alvert Music repeats and realleges each and every allegation set forth in paragraphs 1 through 37 hereof as if fully set forth herein.

39.     As part of a co-venture with Anthony Johnson and B.T.J. Inc., d/b/a Tony Mercedes Records (Ex. B), Alvert Music obtained a publisher's interest in the musical composition "Daizzey Duks."

40.     At some point following the purchase of assets from Bellmark, DM, claiming ownership of publishing rights in the Alvert Compositions and specifically "Daizzey Duks," began administering the rights to record, reproduce and distribute the musical composition "Daizzey Duks" in violation of Alvert Music's exclusive rights enumerated in 17 U.S.C. § 106.

Specifically, DM issued mechanical licenses, synchronization licenses and/or other licenses authorizing digital phonorecord delivery and "streaming" via the Internet for "Daizzey Duks."

41. DM improperly received fees and royalties generated by "Daizzey Duks," including mechanical royalties, performance royalties, synchronization royalties, digital phonorecord delivery royalties and royalties associated with "streaming" music perceived via the Internet.

42. Alvert Music has received no compensation from DM in the form of royalties and/or other fees associated with DM's improper authorizing and licensing the use of "Daizzey Duks," and, to date, the infringements have not been remedied, as DM continues to operate under existing infringing licenses and generate new infringing licenses in direct violation of Alvert Music's rights under 17 U.S.C. § 106. Further, DM continues to hold itself out as the rightful owner of the musical composition "Daizzey Duks".

43. DM engaged in the conduct detailed in the foregoing with knowledge of Alvert Music's ownership in the musical composition "Daizzey Duks" and claims thereto.

### COUNT 4

### ACCOUNTING

44. Alvert Music repeats and realleges each and every allegation set forth in paragraphs 1 through 43 hereof as if fully set forth herein.

45. Alvert Music, due to the infringement and wrongful acts of DM, is entitled to an accounting by DM of amounts relating to the copyrights of Alvert Music in the Alvert Compositions, whereby DM may determine the revenues and profits rightfully belonging to Alvert Music and wrongfully gained by DM.

### TRIAL BY JURY

12

46.     Alvert Music hereby requests trial by jury on all issues wherein trial by jury is permissible.

## PRAYER FOR RELIEF

47.     WHEREFORE, Alvert Music prays judgment as follows:

(1)     that the Court enter Declaratory Judgment that Alvert Music owns the copyrights in the Alvert Compositions, and, further, that all prior assignments and licenses by DM of same are null and void; and/or

(2)     that DM be found liable for direct copyright infringement, as proven at trial; and/or

(3)     that DM be found liable for willful copyright infringement for each infringement; and/or

(4)     that for such copyright infringement DM be ordered to pay Alvert Music:

(a) such damages as Alvert Music has sustained in consequence of DM's infringement of said copyrights, and to account for and pay to Alvert Music all gains, profits and advantage derived by DM from their infringement of Alvert Music's copyrights, the total amount to be determined at a trial of this action, or such damages as shall appear proper within the provisions of the Copyright statute; or in the alternative;

(b) in the event that Alvert Music's actual damages, including DM's profits are less than One Hundred Fifty Thousand ($150,000.00) Dollars for each infringement and DM is found to have willfully infringed, the Alvert Music, in the discretion of the Court, be awarded statutory damages in the amount of One Hundred Fifty Thousand ($150,000.00) Dollars for each infringement pursuant to the provision of 17  U.S.C. §504(c)(2); or in the alternative;

(c) in the event that DM is not found to have willfully infringed and Alvert Music's

actual damages, including DM's profits are less than Thirty Thousand ($30,000.00) Dollars per infringement that Alvert Music in the discretion of the court be awarded statutory damages in the amount of Thirty Thousand ($30,000.00) Dollars for each infringement pursuant to the provision of 17 U.S.C. §504(c)(1); and/or

(5)     that pursuant to 17 U.S.C. §502, DM, its agents, and servants be permanently enjoined from infringing said copyrights of Alvert Music in any manner, including from asserting ownership and licensing, selling and/or otherwise administering in any fashion the Alvert Compositions; and/or

(6) that all amounts received by DM from the date of filing of this suit from the exploitation of the musical composition be placed in an escrow account pending the outcome of this litigation, and that such amounts be awarded to Alvert Music at a conclusion of this case; and/or

(7) that pursuant to 17 U.S.C. §505 DM pays to Alvert Music the costs of this action, prejudgment interest, and reasonable attorney's fees to be allowed to Alvert Music by this Court; and/or

(8) that Alvert Music be awarded attorney's fees, pre- and post-judgment interest and costs; and/or

(9) that DM be ordered to submit to an accounting so that all gains, sales, profits and advantages derived by DM from each of its acts may be determined; and/or

(10)     that Alvert Music be awarded trial by jury on all issues triable by jury;  and/or

(11)     that Alvert Music be awarded all relief to which they are justly entitled.

Respectfully submitted,

By: _____
       Adrienne E. Dominguez
       Texas Bar No. 00793630

THOMPSON & KNIGHT L.L.P.
1700 Pacific Avenue, Suite 3300
Dallas, Texas 75201
(214) 969-1700
Fax: (214) 969-1751

       D'Lesli M. Davis
       Texas Bar No. 05479450

       Richard S. Busch
       Tennessee State Bar No. 14594

       Ralph E. Carter, Jr.
       Tennessee State Bar No. 21417

KING & BALLOW
1100 Union Street Plaza
315 Union Street
Nashville, Tennessee 37201
(615) 259-3456
Fax: (615) 254-7907

ATTORNEYS FOR PLAINTIFF
ALVERTIS ISBELL D/B/A ALVERT MUSIC

Page - 1
07/17/92

## Memorandum Agreement

From: Bellmark/Life Records, A Division of Isbell Records, Inc.
("Bellmark")

To: Anthony Johnson and
B.T.J. Inc. dba Tony Mercedes Records (TMR)

Effective
Date: October ___2___, 1992

Subject: Non-Exclusive "Co-Venture" Manufacturing, Marketing and
Distribution Deal

Purpose: We (each of us) agree to "co-venture" the manufacturing,
marketing and world-wide distribution of recordings you
make, produce and record. Bellmark agrees to provide you
manufacturing, world-wide distribution, marketing
services and/or selling of records of "Duice" ("Artist")
and such other artists as we from time to time mutually
agree upon.

Term: Initial Period of one (1) year with four (4) automatic
Option Periods on an artist-by-artist basis.

Trade name,
Trademark and
Logo: TMR's Product will be distributed in the United States on
the TMR label. International distribution may be on a
different label. Bellmark expressly agrees that the Tony
Mercedes Records trade name, trademark and logo is and
shall remain the sole and exclusive property of TMR
and TMR agrees Bellmark shall be granted a license no
charge to use said trade name, trademark and logo in the
normal course of manufacturing, marketing and
distributing the product.

Recording
Obligation: Such number of recordings as each of us mutually agree
upon, on a project by project basis; except that the Co-
Venture shall have the right to call for one album per
each year of the term of the artist recording contract.
The artist and producers recording contracts shall be
assigned to this Co-Venture.

Recording
Procedure and
Costs:

DM00388
CONFIDENTIAL

We will mutually agree upon the compositions to be
recorded. You agree to pay all costs of production. You
will deliver to us all necessary assignments of
copyrights, mechanical licenses, label copy and copyright
information and other information required to
manufacture, market, distribute and sell records. You


EXHIBIT
A

Page - 2
07/17/92

agree to provide us with signed copies of the artist
recording contracts and all songwriters contracts.

**Division of**
**Gross Profit:**    We agree to pay to you one-half (1/2) of the Gross Profit
realized from the sales of these recordings.  "Gross
Profit" is defined as Net Sales (gross sales less current
returns, credits, rebates, etc.) less all "Payments"
necessary to manufacture, distribute, market, sell and
promote those records and any other mutually agreed upon
payments.  "Payments" are (but are not limited to):

Distribution Expenses:
    Payment Discount
    Distribution Expenses and Fees
    Dealer Advertising
    Dealer Discounts
    Invoice Dating Charges
    Other

Manufacturing Expenses:
    Packaging Concept and Design
    Color Separations
    Mastering
    Pressing
    Container/Jackets
    Manufacturing of Returns
    Third Party Artist and Producer Royalties
    Mechanical license royalty (publishing)
    AF of M Union Contributions
    Other

Marketing, Sales and Promotion Expenses
    Manufacturing of Promotional Units
    Mailing & Freight on Promotional Units
    Concept, Design & Manufacturing of Point of Purchase
        Materials
    Manufacturing of sales promotional items
    Independent Promotion
    Publicity
    Trade Advertising
    Consumer Advertising
    Other

DM00389
CONFIDENTIAL

**Existing**
**Inventory**    You have existing inventory of finished goods consisting
of approximately ___*890*___ 12" singles and ___*9700*___
cassette maxi-singles of recordings of "Duice".  Upon
execution of this this agreement, all such remaining
inventory shall be transferred to Bellmark's distribution
facility in Atlanta, GA.  All proceeds from the sales of
this existing inventory so transferred shall be remitted
by Bellmark to you upon receipt of said proceeds by
Bellmark.                                           *ab*

Page – 3
07/17/92

Statements:     Within 15 days of Bellmark's receipt of sales proceeds of
                this Co-venture's product, Bellmark shall estimate what
                your share of the Gross Profit may be and remit said
                amount to you.

                Bellmark/Life will remit Statements of Sales and Gross
                Profit within forty-five (45) days of the close of each
                calendar quarter.  After taking into account payments of
                estimated Gross Profit, Bellmark shall pay the balance of
                monies due you thereon.  Bellmark/Life shall make its
                books and records available to you for audit (but no more
                than once per calendar quarter and upon thirty days
                written notice from you) with respect to the sale and
                exploitation of these records.

                Bellmark will routinely provide you general business,
                sales and manufacturing information regarding the co-
                venture upon your request and as it becomes available to
                Bellmark.

Reserve:        Bellmark/Life agrees to implement a Reserve (30% on album
                and EP configurations and 50% on single configurations)
                on sales for future credits, rebates, adjustments for
                returns, etc.  During the nineteenth month, the Reserve
                Rate shall be adjusted (up or down), on a record-by-
                record and artist-by-artist basis to reflect the actual
                rate of returns, credits, rebates, etc. and thereafter
                the Reserve Rate shall be so adjusted monthly.  The Album
                Reserve shall be liquidated in the same manner as it is
                created, on a record-by-record basis, upon the release of
                the next album and shall be liquidated over the same
                period of time that occurs between the release of the
                album to be liquidated and the release of the next album
                (for example, if your second album is released twelve
                months after your first album, the reserve for the first
                album's first month sales will be scheduled for
                liquidation over twelve months and remitted on the next
                twelve succeeding monthly Statements of Sales and Gross
                Profit).

                                                    DM00390
                                                  CONFIDENTIAL

Grant of Rights
and
"Work for Hire":    You agree to assign, transfer and sell to us an
                undivided one-half(1/2) interest in all of your right,
                title and interest in all master recordings you make,
                record or produce and that we distribute.  Solely for
                purposes of copyrighting the sound recording, all persons
                involved will be deemed our "employee for hire" and the
                sound recordings shall be copyrighted in both of our
                names.  We shall have the exclusive and perpetual right
                to possess and license the masters and any artwork
                created for use in connection with the masters.  We shall
                have the perpetual right to use your and your producer's

names, likenesses, photographs, etc. in connection with the sale of records.

During the term of this agreement, you hereby exclusively license to the co-venture all of your, your artists and your producers "merchandising rights", including all rights to paper back books, comic books, cartoons, newspaper publications, animated cartoons, toys, drinks and other goods and services whether of a similar or dissimilar nature, together with commercial tie-in rights, premiums, give-aways and the like. In connection with the exploitation by us of the rights granted in this paragraph, and in addition to any amounts payable to you hereunder, we will pay to you one-half (1/2) of our "net receipts" from such exploitation. Returns, trade discounts and actual out-of-pocket expenses shall be excluded from such gross receipts. In connection with your exploitation of these rights you agree to pay to us one-half (1/2) of your "net receipts" from such exploitation.

**Uniqueness of Services and Remedies:** Your and your artist's services are of a unique and peculiar character and we shall be entitled to seek injunctive relief (in addition to any other remedies we may have) against you if you breach this agreement. You agree the artist shall be compensated as required under the California laws regarding personal service contracts ($6,000.00 per year minimum compensation).

**Re-recording Restrictions:** You agree to not re-record any composition subject to the agreement until the later of: (a) five (5) years after the composition is recorded hereunder; or, (b) two (2) years after the expiration of the agreement.

**Controlled Compositions:** The copyright of the Controlled Composition entitled "Dazzey Duks" will be divided equally between your affiliated publishing company yet to be formed, Gigolo Chez Publishing and Bellmark's affiliated publishing company (1/3 share each) and shall be administered by Bellmark's publishing company or designee. The copyrights of all other Controlled Compositions of songs released through this Co-venture will be divided equally between your affiliated publishing company and Bellmark's affiliated publishing company and shall be administered by Bellmark's publishing company or designee. Your affiliated publishing company shall make appropriate assignments of the songwriter agreements to Bellmark's affiliated publishing company.

DM00391
CONFIDENTIAL

Records released through Bellmark/Life Records will be licensed at seventy-five percent (75%) of the minimum statutory rate  with a ceiling (for all compositions) of ten (10) times seventy-five percent (75%) of the minimum statutory rate for albums and two (2) times seventy-five percent (75%) of the minimum statutory rate for singles. In the event the total publishing royalties on any record exceed the above ceilings, we shall have the right, unless otherwise mutually agreed upon, to deduct from any other monies owed to you the amount of such excess.  Any Controlled Composition recorded in different versions or mixes shall be considered a single recording.

**Sale and Assignment of Masters:**  You agree to assign and transfer to us an undivided one-half (1/2) interest of your right, title and interest in all master recordings you make, record or produce which Bellmark/Life accepts.  You will deliver to us all two track and multi-track master tapes together with all other original and duplicate master recordings containing any portion of the performances contained in the master recordings.

**Warranties:**  Each master will be free and clear of all liens unless expressly stated; the compositions recorded will be available for mechanical licensing; your artists will sign appropriate inducement letters to us; the artist will execute the separate Memorandum Agreement regarding the copyright provisions of 17 U.S.C. 205(d) and 37 C.F.R. 201.4 attached hereto as Exhibit "A"; you have the right and power to enter into this agreement; the material recorded will not violate any laws or infringe on any other person's rights.

**Scope of Entire Agreement and Effective Date.**  All transactions between the parties which have occurred and will occur from and after the Effective Date will be governed by the provisions of this Memorandum Agreement.

**Entire Understanding.**  This Memorandum Agreement, together with more complete and formal agreements and all exhibits and schedules attached hereto, shall constitute the Entire Agreement between us, and no modification, amendment, waiver, termination or discharge of the Memorandum Agreement shall be binding upon Isbell Records, Inc. unless made in writing signed by an agent of Isbell Records, Inc.  This Memorandum Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of California.

DM00392
CONFIDENTIAL

Page - 6
07/17/92

THE PARTIES TO THIS AGREEMENT UNDERSTAND THAT THIS IS AN IMPORTANT LEGAL DOCUMENT. THEY HEREBY REPRESENT AND WARRANT THAT THEY HAVE BEEN ADVISED OF THEIR RIGHT TO RETAIN, AND THEY HAVE RETAINED, INDEPENDENT COUNSEL OF THEIR OWN CHOOSING IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT THEY HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAVE KNOWINGLY AND VOLUNTARILY WAIVED THEIR RIGHT TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO THIS AGREEMENT WITHOUT THE BENEFIT OF INDEPENDENT LEGAL REPRESENTATION.

AGREED TO:

Anthony Johnson and
B.T.J. Inc. dba TMR Records

Isbell Records, Inc.

BY: _Anthony R. Johnson -Pres_
    Anthony Johnson   (Title)

BY: _Al Bell dba Bellmark Rec_
    Al Bell, President

DM00393
CONFIDENTIAL

Page - 1
03/30/93

As of March 30ᵗʰ, 1993

Cecil Glenn p/k/a "D.C." and Steve Gibson individually, and
collectively d/b/a Tag Team
and
Tag Team Music, Inc.

RE: Exclusive Producers Agreement

Gentlemen:

This will confirm our understanding and agreement with you with
reference to your (hereinafter referred to as "you" or "Producer")
producing master recordings ("Masters") featuring the performances of
Cecil Glenn p/k/a "D.C." and Steve Gibson.

This will also confirm the agreement between you and Bellmark
Records ("us", "we", "our" or "Company") with respect to your services
as an arranger and record producer. This is a memorandum of the
essential terms of the understanding of the parties. The provisions
hereof shall hereafter be amplified and incorporated in a more formal
agreement satisfactory to the parties. Such agreement shall contain
additional provisions, terms and covenants as are normal in transactions
of this size and character and as are customary in contracts and
instruments of this kind (including artist contracts, accepted artist
requirements, definitions, approvals, breach, incontestability,
covenants, force majeure, suspension and termination; audiovisual
production, royalties, exploitation; films; motion pictures;
exploitation of records, misc.), and when executed, shall supersede this
memorandum. Otherwise, this memorandum shall continue in force and
effect, and shall be binding on the parties. (This Memorandum Agreement
is herein referred to as "the Agreement".)

1.  SERVICES TO BE RENDERED.  Except as expressly setforth herein,
we hereby employ you to render your exclusive services as a producer,
arranger and engineer in respect of the Masters. You hereby accept such
employment and agree to render such services for us during the term
hereof, upon the terms and conditions set forth herein. You hereby
agree and acknowledge that we shall own in perpetuity, throughout the
universe, all rights of every kind and character in the musical
materials and results and proceeds of your services rendered hereunder
and all works, including the Masters, prepared hereunder shall be
considered as Works (including the Masters) made for hire on our behalf
as contemplated and defined in Section 101 of the United States
Copyright Act and you agree and acknowledge that all rights of
copyright, renewal or extensions thereof are vested in us.

EXHIBIT
B

DM 00299
CONFIDENTIAL

2.  (a) TERM.  (i) The term of this Agreement shall be for a
period of two (2) years commencing on the date hereof ("Initial
Period"). You hereby grant to us one (1) consecutive separate option to
extend the term for further periods of three (3) years each ("Option
Period"), upon the same terms and conditions applicable to the Initial
Period, except as hereinafter set forth. The Initial Period and every
Option Period for which we have exercised our option are hereinafter

sometimes referred to together as the "Term".  Each option shall be
exercised automatically upon the expiration of the Initial Period and
shall be deemed exercised by Company, unless Company shall send to you a
written notice terminating this Agreement not later than the thirtieth
day prior to the end of the Initial Period of the then current period.
The term "Option Period" shall mean a period of thirty-six (36)
consecutive months.

      (ii) During each calander year of the Term, you and
we must enter into (pursuant to other terms hereof) a minimum of one (1)
production agreement for the exclusive recording services of a musical
artist (your "minimum commitment").  If you have not fulfilled your
minimum commitment by sixty (60) days before the expiration of the
Option Period concerned, then, without limiting our rights and remedies
in such event, and unless we notify you to the contrary in writing, the
applicable Option Period shall not expire until the date you fulfill
your minimum commitment for such Option Period.

      (iii) You agree to render your services hereunder
diligently, competently and to the best of you ability.

      (b) MINIMUM ALBUM COMMITMENT. We hereby engage your services
or producing and recording phonograph records embodying the
performances of Cecil Glenn p/k/a "D.C." and Steve Gibson (hereinafter
collectively and individually referred to as "Artists") for a term
commencing as of the date hereof and expiring nine (9) months after the
delivery of the term "Fifth Album" (as the term "Fifth Album" is hereinafter
defined) but in no event shall the term expire later than seven (#) Co
years after the date hereof.

      (c) DESIGNATION OF ACCEPTED ARTIST. During the term, you shall
exclusively offer to Company all masters which are available for
distribution in the Territory (throughout the world and entire universe)
or any part thereof, (A) produced by or for you during the Term and/or
(B) obtained and/or owned and/or controlled, directly or indirectly, in
whole or in part, by you during the Term and/or licensed to or otherwise
acquired by you during the Term.

      (d) With respect to the first Masters embodying the
performances of an Artist, Company shall have 60 days following the date
of Company's receipt of such Masters within which to decide whether
Company desires to distribute such Masters pursuant to this Agreement.

      (e) Each Artist whose performances are embodied upon a Master
accepted by Company in accordance with this second paragraph shall be
deemed to be an "Accepted Artist" as of the date of such initial
acceptance and all such Accepted Artists shall sometimes hereinafter
collectively referred to as Accepted Artists or Artists.

      (f) Master recordings embodying the performances of Cecil
Glenn p/k/a "D.C." and Steve Gibson shall, for purposes of this
Agreement, be deemed to be Accepted Artists.

DM 00300
CONFIDENTIAL

(g) During the Term, you shall not directly or indirectly
offer the services, or the product of the services, of any musical
artist to any third party or distributor of the product of such services
itself.  If Company accepts a master embodying the performances of an
artist and thereafter rejects a subsequent master submitted by you
embodying the performances of such artist, then such artist shall be
deemed to be a "Rejected Artist," and you shall not have the obligation
to furnish Company with any additional masters embodying the
performances of such Rejected Artist.

3.  RECORDING COMMITMENT.     During the Term hereof, you agree
that:

(a)  With respect to each Accepted Artist whose performances
are embodied upon Masters accepted by Company hereunder, you shall offer
to Company all such masters embodying the performances of such Accepted
Artist produced and/or acquired by you during the Term.

(b)  You warrant and represent that notwithstanding the
expiration of the Term, you shall offer to Company not less than five
(5) albums embodying performances of each Accepted Artist.

(c)  If, during the Term you shall offer to Company less than
five (5) albums embodying performances of an Accepted Artists, then
notwithstanding the expiration of the Term, you shall be obligated to
deliver to Company a minimum of five (5) albums embodying performances
of such Accepted Artist.

(d)  You shall not without Company's written consent offer to
Company an album embodying performances of an Accepted Artist within six
(6) months of the date that you shall have previously offered to Company
an album embodying performances of such Accepted Artist.

(e)  During the term hereof, you agree to record, produce and
deliver five (5) albums (the "Recording Commitment") on the Accepted
Artist, Cecil Glenn p/k/a "D.C." and Steve Gibson.

4.  ACCEPTED ARTIST CONTRACT PROVISIONS.  You warrant that each of
your contracts with an Accepted Artist ("Artist Contract") shall provide
for:

(a)  A term, which shall consist of an initial period of two (2)
years with an automatic option to extend such term for no less than one
(1) additional period of three (3) years each;

(b)  A minimum recording commitment whereby the Artist is to
perform during each year of the term thereof for no less than sufficient
masters to constitute one (1) album, with the right, exercisable
unilaterally by you, to require the Artist to perform for additional
masters (up to an aggregate of not less than two (2) albums, or the
equivalent);

(c)  A combined royalty rate with respect to an artist and
individual producer of the masters embodying the performances of such

DM 00301
CONFIDENTIAL

artist for disc sales in the United States of America through normal retail channels not exceeding ten percent (10%) with respect to the first 250,000 U.S. Net Sales of each said album; eleven percent (11%) with respect to U.S. Net Sales of albums in excess of 250,000 units but not to exceed 500,000 units; and twelve percent (12%) with respect to U.S. Net Sales of each of said albums in excess of 500,000 units, computed separately on an album-by-album basis;

(d)  Each Artist Contract shall contain the following provision:

"This agreement is subject to assignment to Bellmark Records in accordance with the agreement between Producer and Bellmark Records dated as of *March 30* , 1993, and Bellmark Records shall have the right to exercise, implement or enforce any rights granted to Producer hereunder on Producer's behalf.  In the event of a default by Producer in performing any of its obligations under this agreement, Producer shall not be deemed in breach of any of its obligations unless and until Artist shall send Producer specific notice by certified mail, return receipt requested, of the nature of such default and, simultaneously therewith, duplicate notices, in the same manner to Bellmark Records at 7060 Hollywood Boulevard, Suite 220, Hollywood, CA  90028, Attn: Al Bell, President and Bellmark Records and/or Producer shall have failed to cure such breach or commence curing such breach within sixty (60) days of its respective receipt of such written notice."

5.   ACCEPTED ARTIST REQUIREMENTS:

(a)  During each year of the Term, you shall record and deliver to us Masters the equivalent in playing time of one (1) album for each Accepted Artist.  At our election, you shall record and deliver to us additional masters for each Accepted Artist, however, such additional masters shall not exceed one (1) album, without your consent.

(b)  It is agreed that all masters shall be recorded in a recording studio approved by us.  The compositions to be recorded shall be selected or approved by us and shall consist of newly recorded studio performances of material not previously recorded by the applicable Accepted Artist.  Each master shall be subject to our approval, as commercially satisfactory.  Upon the request of Company, you shall cause Artist to re-record any composition until a commercially satisfactory master shall have been obtained.

6.   DELIVERY OF ACCEPTED ARTIST CONTRACTS.

DM 00302
CONFIDENTIAL

(a)  Promptly following the date upon which a recording artist becomes an Accepted Artist hereunder, you shall furnish Company with an agreement between Producer and each such Artist, which agreement shall be in form and substance satisfactory to Company.

(b)  If, during the term of an Artist Contract, you shall desire to terminate such contract, you shall so notify Company in writing and Company shall thereafter have a period of thirty (30) days within which to notify you of its election to require you to assign such Artist

Contract to Company and you shall execute any papers which Company deems necessary or expedient.  If Company does not desire to have such Artist Contract assigned to it, you shall have the right to terminate such Artist Contract.

7.  <u>MASTER DELIVERY REQUIREMENTS</u>.

(a)  For each Master, you shall deliver to us a DAT, a two-track stereo tape, all multi-track master tapes (including, but not limited to, any twenty-four (24) track master tapes) and upon our request, a monaural tape.  The two-track stereo tapes for the Masters constituting each album to be delivered hereunder shall be assembled on one (or, if necessary, on two) master tape reels.  You shall not own or control, directly or indirectly, any additional copies of the Masters, provided you shall have the right to retain safety copies of the Masters.  All original session tapes and any derivatives or reproductions thereof shall also be delivered to us or maintained at a recording studio or other location (designated or approved by us) in our name and subject to our control.

(b)  The DAT and two-track stereo tape shall be fully edited, remixed and leadered prior to delivery to us, so that it is in proper form for the production of the parts necessary for the manufacture of records.

8.  <u>RECORDING, PROMOTIONAL VIDEO PRODUCTION AND INDEPENDENT PROMOTION COSTS AND EXPENSES AND ALBUM ARTWORK COSTS</u>.  You shall be solely responsible for and promptly pay when due all:  (a)  minimum union scale payments required to be made to Artists in connection with the Masters made and delivered hereunder, including union scale of recording performances, all costs of non-royalty instrumental, vocal and other personnel and arrangements and copying in respect of the recording of the record masters and audio-visual masters (including all sampling fees, payments and royalties and clearance costs and all other recording costs; (b) promotional video (audio-visual) songs/devices production costs; (c) independent promotion costs and expenses paid and/or incurred in respect of the Masters and records derived therefrom hereunder; and (d) record cover artwork costs, including all costs for preparing or causing the preparation of all artwork, photography, designer, illustrator and related materials for the covers, containers, cartridges and packaging of each album of the Recording Commitment, including all such costs and expenses customarily recognized as recording costs, promotional video productions costs, independent promotion costs and expenses and album cover artwork cost in the record and music industry.  In the event we, in our sole discretion, shall pay any of these costs and expenses for any Masters hereunder, you shall repay any such sum(s) upon demand and without limiting our other rights and remedies, we may deduct same from any royalties and/or other monies payable to you hereunder.

DM 00303
CONFIDENTIAL

9.  <u>GRANT OF RIGHTS, NAME AND LIKENESS</u>.  You hereby grant to us and our licensees the sole exclusive and worldwide right in perpetuity to use and permit others to use you name, photographs and likenesses and biographical material concerning you, for advertising and purposes of

trade in connection with phonograph records embodying the Masters and
our distributors and their licensees institutional advertising in
connection therewith. We shall give you appropriate production credit
and `logo` identification on record labels and jacket liner notes
embodying the Masters.

10. ROYALTIES. (a) Conditioned upon your full and faithful
performance of all of the material terms and provisions hereof, we shall
pay you in respect of net sales by us our distributors or licensees of
records embodying the Masters computed on the suggested retail list
price ("SRLP") of such records (except as otherwise provided), the
following royalties upon the terms set forth below. Such royalty shall
include Producers (your) royalties and all royalties (other than
mechanical copyrighted royalties) payable to all artists (including
Accepted Artists), producers and other persons rendering services in
connection with the recording of the Masters that became or may become
due by reason of our exploitation of the Masters, provided that we shall
make and be responsible for payments to the AFM Music Performance Trust
Fund and Special Payments Fund, as well as to any similar funds whose
contributors are based upon the sale of records.

(b) Royalties shall be computed and paid according to the
provisions of this Agreement which are to be amplified and incorporated
in the more formal agreement.

(c) As to records not consisting entirely of Masters recorded
and delivered hereunder (i.e., are coupled), the royalty rate otherwise
payable to you hereunder with respect to net sales of any such record
shall be prorated by multiplying such royalty rate by a fraction, the
numerator of which is the number of Masters recorded and delivered
hereunder embodied on such record and the denominator of which is the
total number of master recordings embodied thereon for which we are
obligated to pay a royalty.

(d) With respect to net sales of (cassette) tape and (disc)
vinyl configuration through normal retail channels in the United States
(such net sales being hereinafter referred to as "U.S. Net Sales") of
the First Album, Second Album, Third Album, Fourth Album and Fifth
Album, ten percent (10%) with respect to the first 250,000 U.S. Net
Sales of each said album; eleven percent (11%) with respect to U.S. Net
Sales of albums in excess of 250,000 units but not to exceed 500,000
units; and twelve percent (12%) with respect to U.S. Net Sales of each
of said albums in excess of 500,000 units, computed separately on an
album-by-album basis ("Base U.S. Album Royalty Rate").

(e) With respect to net sales of CD configurations ["CDs"]
(other than CD-5) and/or "New Configurations" through normal retail
channels in the United States, the royalty shall be 75% of the Base U.S.
Album Royalty Rate.

(f) With respect to new sales of CD configurations ["CDs"]
(other than albums) and/or "New Configurations" through normal retail
channels in the United States, the royalty rate shall be 75% of the

DM 00304
CONFIDENTIAL

royalty rate of mini-LPs, EPs, maxi-singles, cassette singles and/or maxi-cassettes.

(g) With respect to net sales of single records, mini-LPs, EPs, maxi-singles, cassette singles and/or maxi-cassettes through normal retail channels in the United States, the royalty rate shall be one-half (1/2) of the Base U.S. Album Royalty Rate.

(h) With respect to net sales of single records, mini-LPs, EPs, maxi-singles, cassette singles and/or maxi-cassettes through normal retail channels outside the United States, the royalty rate shall be 50% of the royalty rate for single records, mini-LPs, EPs, maxi-singles, cassette singles and/or maxi-cassette in the United States.

(i) With respect to net sales of album records and CDs outside the United States, the royalty rate shall be 50% of the otherwise applicable rate on a configuration-by-configuration basis.

(j) With respect to records sold by our licensees via television and/or radio advertisements through mail order, telephone order or special retail outlets (such as K-Tel-type packages), the royalty shall be one-half (1/2) of the net receipts received by us from their respective licensees.

(k) With respect to budget records and mid-priced records through normal retail channels in the United States, the royalty rate shall be one-half (1/2) of the Base U.S. Album Royalty Rate.

(l) With respect to budget records and mid-priced records sold by our licensees throughout the Territory, the royalty shall be one-half (1/2) the net receipts received by us.

(m) With respect to records sold through Armed Forces, Post Exchanges, Ship Stores and other military facilities ("PX Records"), the royalty rate shall be 50% of the Base U.S. Album Royalty Rate.

(n) We may license Masters for record use and/or for any type of use on a flat fee, royalty rate and/or rent rate basis, in which event, in lieu of any other payment due hereunder, we shall credit your royalty account with 50% of the net royalties actually earned and received by us.

(o) No royalties shall be payable in respect of: (i) records distributed on a "no-charge basis" and (ii) "Free Goods". Producer acknowledges and agrees that (i) with respect to each single record, mini-LP, EP, maxi-single and/or maxi-cassette units sold or shipped by Company or its distributors or licensees shall be "Free Goods", and (ii) with respect to each album hereunder, 15% of the aggregate units sold or shipped by Company or its distributors or licensees shall be "Standard Free Goods". Producer further acknowledges and agrees that in addition to "Standard Free Goods", we may conduct special advertising programs with respect to marketing and merchandising of records hereunder, which may involve the distribution of additional free goods in the dollar amount of

DM 00305
CONFIDENTIAL

Page - 8
03/30/93

advertisement funds paid or committed by us. As to records sold at a discount to "one-stops", rack jobbers, distributors and/or dealers, in lieu of records given away or furnished on a "no-charge" basis, the applicable royalty rate otherwise payable hereunder with respect to such records may be reduced in the proportion that said discount retail or wholesale price bears to the usual stated retail or wholesale price.

(p) In the case of records sold in or with jackets, cartridges, cassettes, boxes, reels or other devices or containers, an amount equal to 10% of the SRLP for single-pocket vinyl-disc albums, mini-LPs, EPs, 7-inch single records in special sleeves and 12-inch single records; 15% thereof for multi-fold vinyl-disc albums or vinyl-disc albums with cardboard sleeves or special inserts or attachments; 20% thereof for analog tapes; 25% thereof for compact discs (other than CDV Devices) and New Configurations, shall be excluded from the base prices against which the applicable royalty rates are to be applied.

(q) No royalties shall be payable to you hereunder, unless and until Company is in a "recouped" position (that is, Company has recouped from royalties otherwise payable hereunder, in accordance with this Agreement and other agreement between you and Company, all recoupable advances, expenses, and other charges incurred or borne by Company under this Agreement and any other agreement between you and Company that are recoupable, including all recording costs, independent promotion costs, promotional video production costs and record cover artwork costs incurred with respect to Masters subject to this Agreement and any other agreement between you and Company).

11.  ROYALTY STATEMENT(S) AND PAYMENT(S).  We shall compute royalties payable to you hereunder, within ninety (90) days after June 30 and December 31 of each year during which applicable records are sold and paid for, and will render a statement and pay such net royalties actually received, less any unrecouped advances and any other permissible off-sets and deductions.  We may maintain reserves which shall be reasonable as to amount and time of liquidation to provide for returns of records distributed or sold hereunder.

12.  EXAMINATIONS.  At any time within one (1) year after any royalty statements is rendered to you hereunder, you shall have the right to give company written notice of your intention to examine Company's books and records with respect to such statement.  Such examination shall be commenced within two (2) years after the date of such notice, at your sole cost and expense, by any certified public accountant designated by you.  Such examination shall be made during Company's usual business hours at the place where Company maintains the books and records which relate to you and which are necessary to verify the accuracy of the statement or statements specified in your notice to Company and your examination shall be limited to the foregoing.  Your right to inspect Company's books and records shall only be as set forth in this paragraph 9, and Company shall have no obligation to produce such books and records more than once with respect to each statement rendered to you.

DM 00306
CONFIDENTIAL

13.   GRANT OF RIGHTS.

(a)   Masters produced by you hereunder and all reproductions
made therefrom, the performances embodied therein and the worldwide
copyrights therein and thereto (including the sound recordings and the
phonorecords), together with all renewals and extensions thereof, shall
be entirely our property, free of any claims whatsoever by or through
you or any party deriving any rights or interests through or from you.
Without limitation of the foregoing, we shall have the exclusive
worldwide and universal rights in perpetuity to manufacture, sell,
distribute and advertise records or other reproductions (visual or
nonvisual) embodying the Masters, to lease, license, convey or otherwise
use or dispose of the Masters by any method now or heretoafter known, in
any field of use; to release records under any trademarks, trade names
or labels, to perform the records or other reproductions publicly and to
permit the public performance thereof by radio broadcast, television or
any other method now or hereafter known, and to permit others to do any
or all of the foregoing, or we may at our election refrain from any or
all of the foregoing.

(b)   To the extent, if any, that you and/or any Accepted
Artist may be deemed an "author" of such "sound recordings", you further
grant to us a power of attorney, irrevocable and coupled with an
interest, for you and/or such Accepted Artist and in your and/or such
Accepted Artist names, to apply for and obtain, and on obtaining same,
to assign to us, all such copyrights and renewals and extensions
thereof, which power of attorney may only be exercised if you or such
Accepted Artist fail to execute and deliver to us any document that we
may reasonably submit to you for execution by us and/or such Accepted
Artist.   You further agree to execute and deliver to us, and to cause
each other person rendering services in connection with the Masters to
execute and deliver to us, written assignments to us (in a form
satisfactory to us) of all sound recording copyrights (including renewal
and extension rights) such person may have.   Without limiting the
foregoing, but subject to the terms and conditions contained in the
Agreement, we shall have the exclusive and perpetual right throughout
the universe to control Masters and all other recordings hereunder, and
we may sell, lease, license and otherwise exploit such Masters or other
recordings hereunder or refrain therefrom, throughout the universe, upon
such terms and conditions, and in such forms, records and versions, as
we may in our sole discretion determine.   You acknowledge that records
embodying Masters may be released under any trademark, trade name or
label designated by us.

DM 00307
CONFIDENTIAL

14.   EXCLUSIVITY; INJUNCTIVE RELIEF.   You expressly acknowledge
that the Masters to be produced hereunder, your services hereunder and
all other rights granted and to be granted hereunder are of a special,
unique and intellectual character which gives them peculiar value, and
that in the event of a breach by you of any term, condition, warranty,
representation, covenant or agreement hereunder we will be caused
irreparable injury.   You expressly agree that in the event of any such
breach, we shall be entitled to injunctive and other equitable relief
and/or damages in addition to any other rights and remedies available to
us and we shall have the right to recoup any damages from any sums which

may thereafter become due and payable to you hereunder, including sums otherwise payable to you after the expiration or termination of the contract.

15.   WARRANTIES AND REPRESENTATIONS; INDEMNITIES.   Producer represents, warrants, covenants and agrees that:

(a)   Producer is under no disability, restriction or prohibition, whether contractual or otherwise, with respect to their right to execute this Agreement and perform its terms and conditions; and, they are under no restriction or obligation that will impair their full performance of their obligations hereunder or impair Company's full enjoyment of its rights hereunder.

(b) In the event Producer incorporates in any of Producer's recorded product any copyrighted sound recordings, copyrighted words and/or copyrighted musical compositions (including, without limitation, any sounds accompanying copyrighted audio visual works) other than the Licensed Masters ("master sound recordings from which the sampled material is taken embodying the recorded performances of Artists") or any portion thereof ("Embodied Copyrighted Materials"), Producer shall procure, in writing, all necessary rights, licenses, consents, authorizations and clearances required to reproduce all such Embodied Copyrighted Materials, and Producer shall pay, all mechanical license fees, all master use fees and re-use fees required under any union agreement (and other sums of any kind or nature whatsoever) which arise or may arise as a result of the embodiment of the Embodied Copyrighted Materials in Producer's masters subject to this Agreement.

—(b)   Producer hereby indemnifies, saves and holds Bellmark harmless from any and all losses, costs, expenses, liability or damage (including attorneys' fees) arising out of or connected with any claim or demand by a third party which is inconsistent with any of the warranties, representations or agreements made by Producer in this Agreement.

(d)   Producer agrees to reimburse Bellmark, on demand, for any payment made by Bellmark at any time with respect to any loss, cost, expense, liability or damage to which the foregoing indemnity applies and in addition thereto, Bellmark shall have the right to deduct from any and all monies otherwise payable to Producer hereunder or under any other agreement a sum(s) equal to such loss, damage and liability (including anticipated and actual court costs and reasonable attorneys' fees, and any other monies or sums paid and/or incurred and anticipated to be paid and/or incurred by Bellmark in connection with and/or as a result of recording, promotional video production, independent promotion and/or processing costs and expenses incurred or paid by Bellmark in respect to the masters subject to this Agreement).

DM 00308
CONFIDENTIAL

(e)   Without limitation of the foregoing, Producer specifically warrants and represents that no selection recorded or to be recorded by any Accepted Artist hereunder is or will be subject to any re-recording or reproducing restriction under any previous recording or production contract to which Accepted Artists may have been a party, and that neither Accepted Artists nor any other person rendering services in

connection with Masters is or will be a party to any contract that would in any way impair the rights granted to Bellmark hereunder.

→ (f)  Each Master shall be free of all liens and encumbrances, and there will be no claims, demands or actions pending or threatened with respect thereto other than any such liens, encumbrances, claims, demands or actions arising from Company's acts or omissions.

(g)  Neither any name(s) utilized by Producer, Accepted Artist, the Masters, any of the selections embodied therein, any other matters or materials supplied by Producer hereunder, nor any exploitation or use of any of the foregoing, shall violate or infringe upon any civil, personal or proprietary rights of any person, including, without limitation, trademarks, trade names, copyrights and rights of privacy and publicity.

(h) If Bellmark believes that its distribution, sales, marketing, license for exploitation of any of Producer's recorded product under this Agreement will constitute a breach of any Producer's and/or Accepted Artists' warranties and representations contained in this Agreement, then, without prejudice to any other rights its may have, Bellmark may at any time, and with written notice to Producer, withhold or withdraw such recorded product from distribution;

(i)  Accepted Artists shall execute Artists Inducement Letters in the form and substance of Exhibit "A" attached hereto or as required by, and for the benefit of, Bellmark.

(j) Other than as specifically set forth in this agreement, Company shall be subject to no costs, fees, advances, charges or royalties for or in connection with the recording, sale, use or exploitation of the Masters.

(k) During the term of this agreement, you shall cause Accepted Artists to execute exclusive artist recording agreements with you.

(l) You will procure and deliver to us true copies of all Accepted Artists most recent and last artists recording agreements and/or inducement letters signed by them and all related releases or terminations thereof.

16.   EXCLUSIVITY; RE-RECORDING RESTRICTIONS; COVENANTS.

DM 00309
CONFIDENTIAL

(a) You, on your and all other Accepted Artists behalf, agree that all other Accepted Artists shall not perform in any manner any selection (or portion thereof) recorded hereunder, whether or not released by us, for the purpose of making records for distribution or sale in the universe by or for any person other than us, at any time prior to the later of the following dates (such later date, with respect to any such selection, is hereinafter sometimes referred to as the "Restriction Date"): (i) five (5) years after the date of delivery to us of the last Master embodying such selection, and (ii) two (2) years after the expiration or termination of the term of this agreement or any subsequent agreement between us and any person relating to all other Accepted Artists recording services.

(b) Neither you nor any Accepted Artists shall at any time
manufacture, distribute or sell, or directly or indirectly authorize the
manufacture, distribution or sale in the universe by any person other
than us of phonograph records embodying (i) any performance rendered in
any manner by Accepted Artist during the term of this agreement, or (ii)
any performance rendered in any manner by Accepted Artist after the
expiration or termination of the term of this agreement of a selection
recorded hereunder, whether or not released by us, if such performance
is rendered prior to the Restriction Date applicable thereto.
Furthermore, Accepted Artists shall not record, nor shall you or
Accepted Artists directly or indirectly authorize to be recorded for any
purpose, any such performance without in each case taking all reasonable
measures necessary to prevent the manufacture, distribution or sale in
the the universe at any time by any person other than us of phonograph
records embodying such performance. Specifically, but without limiting
the generality of the foregoing, if, after the expiration or termination
of the term of this agreement, Accepted Artist performs for any purpose
any selection recorded hereunder prior to the Restriction Date
applicable thereto, Accepted Artist will do so only pursuant to a
written contract containing an express provision that neither such
performance nor any recording thereof will be used directly or
indirectly for the purpose of making phonograph records for distribution
or sale in the universe. Upon our request, you or Accepted Artist shall
promptly deliver to us a true and correct copy of the pertinent
provisions of each such contract.

17.   DEFAULTS AND REMEDIES.

(a) Each of the following shall constitute an event of
default hereunder:

(i) Artists' voice and/or performing ability become
impaired as determined by a physician designated by us or Artist cease
to seriously pursue their careers as entertainers or you and/or Artist
fail, refuse or neglect to fulfill any of your or their respective
material obligations hereunder and/or under their Artist Recording
Agreement(s) with you.

(ii) In the event you fail or refuse to guarantee for the
exclusive recording services of each Artist the minimum annual statutory
compensation required by Calif. C.C.P. 526 and Calif. C.C. 3423 to
establish and preserve Company's right to injunctive relief to prevent a
breach by Producer and/or Artists under this Agreement.

DM 00310
CONFIDENTIAL

(b) On the occurrence of any event of default, we may, in
addition to our other rights or remedies, by notice to you, elect to (i)
suspend our obligations to you hereunder for the duration of such event
(except that we shall not suspend our obligation to pay royalties earned
hereunder if your failure to perform your obligations is caused by
reasons beyond your reasonable control), (ii) terminate the terms of
this agreement by written notice to you given at any time (whether or
not during a period of suspension based on such event or based upon any
other event), and thereby be relieved of all liability other than any

obligations hereunder to pay royalties in respect of Masters delivered
prior to such termination and/or (iii) require Artist to render their
exclusive recording services (and Artists' services as individual
producers to the extent required hereunder) directly to us in accordance
with Artists' inducement letter(s), Exhibit "A" attached hereto.

18.   MECHANICAL COPYRIGHT ROYALTIES: CONTROLLED
COMPOSITIONS.   All selections recorded in any Masters
produced hereunder which are written or composed by you, in whole or in
part, alone or in collaboration with others, or owned or controlled, in
whole or in part, directly or indirectly, by you or any person, firm or
corporation in which you have a direct or indirect interest (herein
referred to as "Controlled Compositions") are hereby licensed to us for
the United States and Canada at the applicable royalty rates set forth
below per selection on the basis of records sold and paid for, less free
goods, returns and credits, except that no copyright royalties shall be
payable in respect of records for which no royalties are payable
pursuant to paragraph 9 hereof and for printing and reproducing the
title and lyrics of each Controlled Composition embodied in a master on
the packaging of phonograph records embodying the Masters:

(a) With respect to each Controlled Composition on records
sold in Canada--two cents ($.02) and with respect to each Controlled
Composition on records sold in the United Sates--seventy-five percent
(75%) of the minimum statutory royalty rate.  As used herein, the
"Minimum Statutory Royalty Rate" shall mean the minimum statutory
royalty rate payable under the United States Copyright Act for the
compulsory license of a nondramatic musical work, calculated at the rate
per selection in effect in the United States at the time such selection
shall be initially recorded hereunder.

→ (b) You hereby grant to us and our designees, at no fee,
royalty, or other cost to us our designees, the irrevocable, non-
exclusive right, throughout the world to reproduce and publicly perform
each Controlled Composition on Audio-Visual Recordings, to distribute
Audio-Visual Records embodying those Audio-Visual Recordings, and
otherwise to exploit in any manner and through any media those Audio-
Visual Recordings for promotional purposes.

(c) No copyright royalties shall be payable in respect of
Controlled Compositions which are arrangements of selections in the
public domain.

→(d) Any assignment made of the ownership or copyrights in or
the right to license or administer the use of any Controlled
Compositions shall be subject to the terms and provisions hereof.

DM 00311
CONFIDENTIAL

⚹⚹⚹ → (e) For good and valuable considerations, the receipt of
which is hereby acknowledged, you hereby assign, transfer, convey and
sell fifty percent (50%) interest in and to publisher's share of each
Controlled Composition defined in paragraph 18 above, and each
Composition pursuant to the terms and conditions of Exhibit "B" attached
hereto and incorporated herein.

Page - 14
03/30/93

19. SALE AND ASSIGNMENT OF MASTERS: For good and valuable consideration, receipt of which is hereby acknowledge, you hereby assign and transfer to Company one hundred percent (100%) of your right, title and interest in all masters (including audio-visual devices) now existing and to be created and recorded by Accepted Artists during the Term of this Agreement. To such effect, you and Accepted Artists agree to execute and deliver herewith the "Assignment of the Masters and Rights to Copyright" in the form and substance of Exhibit "C". You will deliver to Company, at a mutually agreed upon location, all two track and multi-track master tapes together with all other original and duplicate master recordings containing any portion of the performances contained in the master recordings and/or audio-visual devices.

20. GRANT OF POWER OF ATTORNEY: You and Accepted Artists and Writers (by Accepted Artists and Writers signatures at the foot hereof) hereby irrevocably and coupled with an interest, constitute, authorize, empower and appoint Company and its affiliated designee publisher or any of their agents and officers your, Accepted Artist's and Writer's true and lawful attorneys (with full power of substitution and delegation), in your, Accepted Artists' and Writers' name and in your, Accepted Artists' and Writers' place and stead, or in Company's affiliated designee publisher's name, to take and do such action, and to make, sign, execute, acknowledge and deliver any and all instruments and/or documents, which Company and/or it's affiliated designee publisher from time to time may deem desirable or necessary to effectuate the intents and purposes of the "Grant of Rights" and "Sale and Assignment of Masters" and "Mechanical Copyrights; Controlled Compositions" provisions hereof and to accomplish, evidence and to perfect the rights granted to Company and it's affiliated designee publisher to vest in Company, its successors and assigns and Company's affiliated designee publisher, its successor and assigns, exclusively, perpetually and throughout the world and universe, all of the rights, title and interests granted by you, Accepted Artists and Writers in the masters, sound recordings, musical compositions, and other rights granted under this Agreement, including without limitation, the "Assignment of the Masters and Rights to Copyright" in the form and substance of Exhibit "C" and "Assignment of Musical Compositions and Rights to Copyrights" in the form and substance of Exhibit "B", and such documents and instruments as Company and our affiliated designee publisher shall deem desirable and necessary to secure the universal copyrights for all sound recordings and controlled compositions for their entire term and for all renewals and extensions under any present and future laws throughout the universe.

DM 00312
CONFIDENTIAL

21. NOTICES. All notices to be given to you hereunder and all statements and payments to be submitted or given to you hereunder shall be addressed to you at the address set forth on page 1 hereof or at such other address as you shall designate in writing from time to time. All notices to be given to us hereunder shall be addressed to us at the address set forth on page 13 hereof or at such other address as we shall designate in writing from time to time. All notices shall be in writing and shall either be served by registered or certified mail, return receipt requested, all charges prepaid. The date of mailing shall be deemed the date of service.

22.   ASSIGNMENT.   We may, at our election, and without written notice to you, assign this Agreement or any part hereof to any party who is or who shall be an affiliate or to any party who shall acquire a substantial portion of our stock or assets.

23.   RELATIONSHIP OF PARTIES.   Nothing herein contained shall constitute a partnership between, or a joint venture by, you and us. Neither party hereto shall hold itself out contrary to the terms of this paragraph, and neither you nor we shall become liable for any representation, act or omission of the other contrary to the provisions hereof.   This contract shall not be deemed to give any right or remedy to any third party whatsoever unless said right or remedy is specifically granted by us in writing to such third party.

24.   PROMOTIONAL ACTIVITIES OF ARTISTS.   You agree to cause Artists, from time to time, at our request, whenever same will not unreasonably interfere with other professional activities of Artists, to appear at photographic sessions in connection with the creation of artwork, for poster and cover artwork to be used for the advertising, marketing and promotion of records hereunder; appear for interviews with representatives of the press and our publicity personnel; and advise and consult with us regarding Artists' performances hereunder.   You also agree to cause Artists, if requested by us and subject to Artists' reasonable availability, to make personal appearances on radio and television and elsewhere and record taped interviews, spot announcements, trailer and electrical transcriptions, all for the purpose of advertising, exploitation and/or promoting records hereunder. Artists shall not be entitled to any compensation for such services, except as may be required by applicable union agreements.

25.   MERCHANDISING AND ANCILLARY RIGHTS.   You acknowledge and agree that all "merchandising rights" and "ancillary rights" are granted to Company hereunder and Company shall have the exclusive and worldwide and universal right to use and/or license others to use Producer's and Artists' name and/or likenesses in connection with the promotion and exploitation of the Masters and video sons hereunder.   Company shall render statements and pay Producer with respect to all merchandising and ancillary rights hereunder, 50% of the net receipts actually received by Company (in a like manner) as provided in paragraph 8 hereof.

26.   NO MINIMUM SALES WARRANTY.   You recognize that the sale of records is speculative and agree that the judgment of Company with regard to any matter effecting the sales, distribution or exploitation of such records shall be binding and conclusive upon you.   Nothing contained in this agreement shall obligate Company to manufacture, sell, license or distribute records manufactured from Masters delivered hereunder.

27.   CURE OF ALLEGED BREACH.   No alleged breach of this Agreement by Company shall be deemed material unless within thirty (30) days after you learn of such alleged breach you serve notice thereof on Company specifying the nature thereof and Company fails to cure such alleged breach, if any, within sixty (60) days thereof.

DM 00313
CONFIDENTIAL

28.  DEFINITIONS.  (a) "phonograph record" or "record" or "master recording" mean and refer to all forms of discs, tapes and other devices (whether now known or unknown, and however used, embodying sound alone and sound accompanied by visual images) upon which sound, derived in whole or in part from Masters, is recorded, and which are recorded, produced and manufactured into finished records, including the package into which they are assembled; (b) "video song" means a film, video tape or other device used for the reproduction of a combination of Producers' and/or Artists' audio performances of one (1) musical selection and a visual rendition of Producers' and/or Artists' performances (or other visual accompaniment, including a dramatization of the applicable musical selection); (c) "CDV-5 Device" shall mean a CDV Device released in the form of a 5-inch laser-read compact disc; (d) "album" means a set of no less than ten (10) Masters having and aggregate playing time of no less than thirty-two (32) minutes; (e) "mini-LP" or "EP" means a set of no less than four (4) and no more than seven (7) Masters; (f) "single" or "single record" means set of three (3) or fewer Masters; (g) "configuration" refers to each particular format in which records are now or will in the future be manufactured and distributed, including but not limited to , 7" single records, 12" single records, conventional analog tape, digital audio tape, black vinyl disc albums, compact disc albums and compact video discs; (h) "Masters" means and refers to all recordings embodied in any any form (including audio-visual video recordings) from which records may be derived, now or hereafter owned, controlled and/or acquired by Producer (paragraphs 1-4 and 10 of this Agreement); and (i) "Territory" means throughout the entire world and universe.

29.  STATEMENTS AND PAYMENTS AND CROSS-COLLATERIZATION.

(a)  Company shall not be required to account to and/or render seperate statements to you on account of sales of records hereunder by Bellmark bearing such label or recorded by any such Artist, but rather Company may render a single consolidated statement for all such records distributed, sold or licensed by Company hereunder and Company may cross-collaterize and set-off all debits and credits owed by or to Company in respect of any and all such records, so as to arrive at a net balance due to or payable by Company hereunder.

(b)  Company shall have the right to set-off any royalties any/or deficits arising under this Agreement or any other agreement between you and Company.  For the avoidance of doubt, Company shall have the right to cross-collaterize earnings or deficits (debits and credits) under any future agreement between you and Comapny.

30.  GOVERNING LAW AND JURISDICTION.  This Agreement shall not be binding upon us until signed by you and countersigned by our duly authorized agent.  This Agreement shall be deemed to have been made in the State of California, and its validity, construction and effect shall be governed by the laws of the State of California applicable to agreements wholly performed therein.  If any provision of this Agreement shall be declared invalid, same shall not affect the validity of the remaining provisions hereof.

DM 00314
CONFIDENTIAL

Page - 17
03/30/93

31.  ENTIRE AGREEMENT.  This Agreement, together with all exhibits hereto, sets forth the entire agreement between you and us with respect to the subject matter hereof.  No modification, amendment, waiver, termination or discharge of this Agreement of of any provisions hereof shall be effective unless confirmed by a written instrument signed by a duly authorized agent of the party sought to be bound.  No waiver of any provision of this Agreement or of any default hereunder shall affect the waiving party's rights thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar.

32.  EXECUTION.  This agreement shall not be binding until it and the accompanying inducement letters and all riders, if any, are executed by all parties.

33.  YOU UNDERSTAND AND AGREE THAT THIS IS AN IMPORTANT LEGAL DOCUMENT.  YOU HEREBY REPRESENT AND WARRANT THAT YOU ARE AWARE OF YOUR RIGHT TO RETAIN LEGAL COUNSEL IN CONNECTION WITH THE NEGOTIATIONS AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAVE KNOWINGLY AND VOLUNTARILY WAIVED YOUR RIGHT TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO THIS AGREEMENT WITHOUT THE BENEFIT OF LEGAL REPRESENTATION.

DM 00315
CONFIDENTIAL

Page - 18
03/30/93

If the foregoing terms correctly reflects your understanding and agreement with us, please so indicate by signing below.

Very truly yours,

BELLMARK RECORDS, a division of
Isbell Records, Inc.

By: _____
    Al Bell, President

Address:  7060 Hollywood Boulevard - #220
          Hollywood, CA  90028

AGREED TO AND ACCEPTED:

Cecil Glenn p/k/a "D.C." and Steve Gibson individually, and
collectively d/b/a Tag Team
and
Tag Team Music, Inc.

_Cecil L Glenn_
Cecil Glenn p/k/a "D.C."
Address: _2628 N.E. ExP D3_
         _Atlanta, GA 30345_

_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_
Social Security Number

_Stephen Jh_
     Steve Gibson
Address: _3160 Buford Hwy F-7_
         _Atl GA 30329_

_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_
Social Security Number

Tag Team Music, Inc.

By: _Cecil L Glenn  President_
    (Name)          (Ttile)

Address: _2628 N.E. Exp D3_
         _Atlanta, GA 30345_

_____
Federal Tax I.D. Number

DM 00316
CONFIDENTIAL

## EXHIBIT A

## ARTIST INDUCEMENT AND AGREEMENT

In order to induce BELLMARK RECORDS ("Company") to enter into the Memorandum Agreement dated as of March 30, 1993 ("Agreement") between Company and Cecil Glenn p/k/a "D.C." and Steve Gibson individually, and collectively d/b/a Tag Team and Tag Team Music, Inc. ("Producer"), which I have read and understand, and which is beneficial to my career, I represent, warrant and agree, for the express and direct benefit of Company, as follows:

1.   I shall be bound by the Agreement to the extent that it relates to me and I hereby join in the grants, representations and warranties made therein, and I agree not to take any actions that are or may in any way be inconsistent with Company's rights and privileges thereunder. Without limiting the foregoing, I agree to perform all the terms and provisions of my present recording agreement with Producer regarding my recording services (such agreements being hereinafter collectively referred to as the "Producer's Contract") and the Agreement and, subject to any restrictions and conditions set forth in the Agreement, I hereby confirm the grant to Company of the perpetual right in the Territory ("Territory" means the entire universe) to use and publish and permit other to use and publish my name (including my professional name), signatures, likenesses, voices, sound effects and biographical material concerning me for advertising and trade purposes in connection with the phonograph record business and products of Company. If the Agreement is inconsistent with the Producer's Contract, the obligations of the Agreement shall supersede those of the Producer's Contracts.

2.   Except as provided by the terms of the Agreement, I shall not perform for any person for the purpose of making records and audio-visual devices to be distributed anywhere in the Territory except for records and audio-visual devices pursuant to the Agreement during the Term thereof, including all renewals, extensions and periods of suspension and all periods add by amendments or by other agreements, including the term of any agreement directly between Company and me pursuant to paragraph 4 hereof. During such entire period, I will not engage in making records and audio-visual devices for distribution in the Territory for anyone other than Producer and Company and I will not authorize the use of my name, likenesses, or other identification for the purpose of distributing, selling, advertising or exploiting records and audio-visual devices in the Territory for anyone other than Company and Producer, nor will I perform any selection recorded pursuant to the Agreement for the purpose of making records and audio-visual devices for anyone other than Producer or Company at any time prior to the later of (1) five (5) years after the delivery to Company of the last Master embodying such selection, and (ii) two (2) years after the expiration or other termination of my employment under the Agreement and hereunder or under any other agreement between Company and me or Company and Producer relating to my recording services (such later date, with respect to any such selection, is hereinafter sometimes referred to as the "Restriction

DM 00317
CONFIDENTIAL

03/24/93 Page - 2

3.   Subject to paragraph 4 below, I shall look solely to Producer
for the payment of compensation, fees and/or royalties, as the case may
be, and I will not assert any claim in this regard against Company or
attempt to prevent the manufacture, sale, distribution or exploitation of
records and audio-visual devices or other derivatives manufactured from
Masters subject to the Agreement.  I warrant and represent that, pursuant
to my exclusive recording agreement with Paragon Productions
("Producer"), I am entitled and guaranteed to receive, in respect solely
of the services rendered by me thereunder and for Company's benefit
pursuant to the Agreement, the minimum statutory per annum compensation
during the term of the Agreement.  I further warrant and represent that
in the event the California C.C.P. Section 526 and/or California C.C.P.
Section 3423 is amended or supplemented, the provisions of my exclusive
recording contract with Producer are automatically deemed amended
pursuant to the provisions thereof so as to provide for me to receive
annual compensation pursuant to said exclusive recording contract in the
amount of the applicable amended or supplemented law specifies.  I
acknowledge and confirm that my subject agreement is intended to
establish and preserve Company's right to injunctive relief to prevent a
breach by Producer and/or me of the Agreement and/or of the provisions of
is Inducement letter agreement.  If during any twelve (12) month period
during the Term of the Agreement (with the first such period commencing
as of the date hereof and ending one (1) year after such date) (during
which the California statutory minimum compensation become applicable, if
at all) the aggregate of royalties, advances and recording session fees
payable to me by Producer has not equaled or exceeded the statutory
minimum compensation, I shall promptly give Company and Producer written
notice thereof.  All amounts paid by Company to me pursuant to this
paragraph 3 shall be advances against any and all royalties and other
monies payable to me hereunder or under the Agreement.

DM 00318
CONFIDENTIAL

4.   In the event I assert that Producer is not entitled to my
services in respect of the Territory during the terms of the Agreement
(including renewals, extension, amendments or other agreements) for any
reason whatsoever or in the event Producer fails or refuses to deliver to
Company any master recording (Albums) containing my performances required
to be delivered to Company pursuant to the Agreement of Producer
otherwise is not entitled to require me to deliver any album of the
Accepted Artist Recording Obligation (defined in the Agreement) or
Producer otherwise breaches the Agreement, I hereby agree to execute an
agreement directly with company for my recording services.  Such
agreement shall be (i) identical to the Agreement except as modified to
reflect that such agreement is directly with me, (ii) be for an equal
term of the Agreement, (iii) provide for the obligation on my part to
record for Company during the term of such Agreement the number of Albums
at were to be delivered by Producer to Company, and (iv) provide for
the payment to me of compensation for my recording services.  I hereby
irrevocably appoint Company my attorney-in-fact to execute such contract
on my behalf.  Nothwithstanding the foregoing, the election of Company
not to require me to enter into such agreement directly with Company of
the failure or refusal by me to sign such agreement shall not in any
manner affect or derogate from Company's rights pursuant to paragraph 4

5.   (a)  I acknowledge that the rights, privileges, benefits and remedies granted to Producer in the Producer's Contract, may be enforced against me directly by Company in the name of Producer or in Company's own name and in its own behalf in any court of competent jurisdiction, whether or not Producer is a party to the litigation.

(b)  This Artist Inducement and Agreement shall be governed by the laws of the State of California applicable to contracts made and to be wholly performed in the State of California.

6.   I acknowledge that my services are of a special, unique and intellectual character that gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated for in damages in an action at law, and that a breach of my obligations under the Agreement will cause Company irreparable injury and damage, entitling Company to seek injunctive and other equitable relief in addition to its other rights and remedies.

7.   I hereby represent and warrant that; (a) I and/or Producer shall be the sole or co-owner(s) of the professional name "Al-C" (the "Name") and will be the sole owner of any other name that I may now or hereafter utilize (with Company's prior written consent, which shall not be unreasonably withheld) in connection with phonograph records and audio-visual devices; (b) subject to any rights granted to third parties prior to the date hereof, no other person, firm or corporation shall have the right to use the Name or any other name that I may now or hereafter utilize or to permit it to be used in connection with phonograph records and audio-visual devices in the Territory; and (c) I have the authority, and have granted same to Producer, to use the Name or any other name that I may now or hereafter use as provided in the Agreement.  During the term of the Agreement, I shall not abandon the Name specifically referred to in this paragraph 7 without Company's prior written consent.

8.   (a)  I hereby acknowledge and agree that each phonograph record master recorded under the Agreement embodying the results and proceeds of my services (individually a "Master" and collectively the "Masters") is a work made for hire in that (i) it is prepared within the scope of Producer's engagement of my exclusive personal services as a recording artist, or (ii) as one selection contained in a long-playing phonograph record album, it constitutes a work specifically ordered by Producer and Company for use as a contribution to a collective work.  I further acknowledge and agree that Producer is the exclusive owner of all rights (including, but not limited to the exclusive copyrights) throughout the Territory in and to each such Master, including the "sound recording" (as defined in 17 U.S.C. Section 101) fixed therein (the "work") and the "phonorecord" (as defined in 17 U.S.C. Section 101) itself, as well as all "phonorecords" manufactured therefrom, and that Producer has the right to exercise all rights of the copyright proprietor with respect thereto, including but not limited to all exclusive rights specified in 17 U.S.C. Section 114(a).

DM 00319
CONFIDENTIAL

(b)  Notwithstanding the provisions of paragraph 8(a) above, I agree that, to the extent, if any, that ...

03/24/93 Page - 4

any Work, I hereby grant and assign to Company all rights of any nature whatsoever (including, but not limited to the exclusive copyrights therein and thereto), throughout the Territory, in and to such Work, including but not limited to the exclusive rights specified in 17 U.S.C. Section 114.

9.   I hereby agree to indemnify and hold Company harmless from and against any liability, damage, cost and expense (including costs and reasonable attorney's fees) occasioned by or arising out of any claim, demand or action inconsistent with this inducement and any grants, representations, warranties or agreements herein which is reduced to final non-appealable judgment or settled with my written consent, which consent shall not be unreasonably withheld.  Company agrees to give me notice of any action to which the foregoing indemnity applies, and I may participate in the defense of same, at my expense, through counsel of my choice, provided that the final control and disposition of same (by settlement, compromise or otherwise) shall remain with Company.  I, at Company's request, will cooperate fully with Company in any controversy that may be brought by third parties concerning this inducement letter or any of Company's rights hereunder.  If I fail to consent to a proposed settlement, Company shall nonetheless have the right to enter into such proposed settlement, but, in such event, I shall not be liable for the amount of the settlement, but shall be liable for expenses (including costs and attorney's fees) that Company incurred up to and including the date as of which the claim is settled.  Alternatively, if I fail to consent to a proposed settlement and Company elects not to enter into such settlement agreement in accordance with the immediately preceding sentence, I shall thereafter directly bear all costs of defense and shall promptly reimburse Company for all costs incurred by Company (including costs and attorney's fees) up to and including the date which I failed to consent to the proposed settlement, and if I fail to promptly undertake such future costs, Company may settle such claim in its sole discretion and my indemnification shall apply to such settlement.

10.   I agree that my Producer Agreement(s) with Producer contains or shall be deemed to contain the following provision:

"This agreement is subject to assignment to Bellmark Records in accordance with the agreement between Producer and Bellmark Records dated as of March 32, 1993, and Bellmark Records shall have the right to exercise, implement or enforce any rights granted to Producer hereunder on Producer's behalf.  In the event of a default by Producer in performing any of its obligations under this agreement, Producer shall not be deemed in breach of any of its obligations unless and until Artist shall send Producer specific notice by certified mail, return receipt requested, of the nature of such default and, simultaneously therewith, duplicate notices, in the same manner to Bellmark Records at 7060 Hollywood Boulevard, Suite 220, Hollywood, CA 90028; Attn: Al Bell, President and Bellmark Records and/or Producer shall have failed to cure such breach or commence curing such breach within sixty (60) days of its respective receipt of such written notice."

DM 00320
CONFIDENTIAL

03/24/93 Page - 1

## EXHIBIT A

## ARTIST INDUCEMENT AND AGREEMENT

In order to induce BELLMARK RECORDS ("Company") to enter into the Memorandum Agreement dated as of March 30th 1993 ("Agreement") between Company and Cecil Glenn p/k/a "D.C." and Steve Gibson individually, and collectively d/b/a Tag Team and Tag Team Music, Inc. ("Producer"), which I have read and understand, and which is beneficial to my career, I represent, warrant and agree, for the express and direct benefit of Company, as follows:

1.  I shall be bound by the Agreement to the extent that it relates to me and I hereby join in the grants, representations and warranties made therein, and I agree not to take any actions that are or may in any way be inconsistent with Company's rights and privileges thereunder. Without limiting the foregoing, I agree to perform all the terms and provisions of my present recording agreement with Producer regarding my recording services (such agreements being hereinafter collectively referred to as the "Producer's Contract") and the Agreement and, subject to any restrictions and conditions set forth in the Agreement, I hereby confirm the grant to Company of the perpetual right in the Territory ("Territory" means the entire universe) to use and publish and permit other to use and publish my name (including my professional name), signatures, likenesses, voices, sound effects and biographical material concerning me for advertising and trade purposes in connection with the phonograph record business and products of Company. If the Agreement is inconsistent with the Producer's Contract, the obligations of the Agreement shall supersede those of the Producer's Contracts.   DM 00322
CONFIDENTIAL

2.  Except as provided by the terms of the Agreement, I shall not perform for any person for the purpose of making records and audio-visual devices to be distributed anywhere in the Territory except for records and audio-visual devices pursuant to the Agreement during the Term thereof, including all renewals, extensions and periods of suspension and all periods add by amendments or by other agreements, including the term of any agreement directly between Company and me pursuant to paragraph 4 hereof. During such entire period, I will not engage in making records and audio-visual devices for distribution in the Territory for anyone other than Producer and Company and I will not authorize the use of my name, likenesses, or other identification for the purpose of distributing, selling, advertising or exploiting records and audio-visual devices in the Territory for anyone other than Company and Producer, nor will I perform any selection recorded pursuant to the Agreement for the purpose of making records and audio-visual devices for anyone other than Producer or Company at any time prior to the later of (i) five (5) years after the delivery to Company of the last Master embodying such selection, and (ii) two (2) years after the expiration or other termination of my employment under the Agreement and hereunder or under any other agreement between Company and me or Company and Producer relating to my recording services (such later date, with respect to any such selection, is hereinafter sometimes referred to as the "Restriction

03/24/93 Page - 2

3.     Subject to paragraph 4 below, I shall look solely to Producer for the payment of compensation, fees and/or royalties, as the case may be, and I will not assert any claim in this regard against Company or attempt to prevent the manufacture, sale, distribution or exploitation of records and audio-visual devices or other derivatives manufactured from Masters subject to the Agreement. I warrant and represent that, pursuant to my exclusive recording agreement with Paragon Productions ("Producer"), I am entitled and guaranteed to receive, in respect solely of the services rendered by me thereunder and for Company's benefit pursuant to the Agreement, the minimum statutory per annum compensation during the term of the Agreement. I further warrant and represent that in the event the California C.C.P. Section 526 and/or California C.C.P. Section 3423 is amended or supplemented, the provisions of my exclusive recording contract with Producer are automatically deemed amended pursuant to the provisions thereof so as to provide for me to receive annual compensation pursuant to said exclusive recording contract in the amount of the applicable amended or supplemented law specifies. I acknowledge and confirm that my subject agreement is intended to establish and preserve Company's right to injunctive relief to prevent a reach by Producer and/or me of the Agreement and/or of the provisions of this Inducement letter agreement. If during any twelve (12) month period during the Term of the Agreement (with the first such period commencing as of the date hereof and ending one (1) year after such date) (during which the California statutory minimum compensation become applicable, if at all) the aggregate of royalties, advances and recording session fees payable to me by Producer has not equaled or exceeded the statutory minimum compensation, I shall promptly give Company and Producer written notice thereof. All amounts paid by Company to me pursuant to this paragraph 3 shall be advances against any and all royalties and other monies payable to me hereunder or under the Agreement.

4.     In the event I assert that Producer is not entitled to my

se
(1
re
Co
to
ot
Ac
Pr
ag
ag
re
te
re
tl
tl
i1
or
nc
tl

DM 00323
CONFIDENTIAL



ase 4:07-cv-00146-RAS   Document 11   Filed 06/03/08   Page 46 of 58 PageID #: 111

3/24/93 Page - 3

5. (a) I acknowledge that the rights, privileges, benefits and remedies granted to Producer in the Producer's Contract may be enforced against me directly by Company in the name of Producer or in Company's own name and in its own behalf in any court of competent jurisdiction, whether or not Producer is a party to the litigation.

(b) This Artist Inducement and Agreement shall be governed by the laws of the State of California applicable to contracts made and to be wholly performed in the State of California.

6. I acknowledge that my services are of a special, unique and intellectual character that gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated for in damages in an action at law, and that a breach of my obligations under the Agreement will cause Company irreparable injury and damage, entitling Company to seek injunctive and other equitable relief in addition to its other rights and remedies.

7. I hereby represent and warrant that (a) I and/or Producer shall be the sole or co-owner(s) of the professional name "Al-C" (the "Name") and will be the sole owner of any other name that I may now or hereafter utilize (with Company's prior written consent, which shall not be unreasonably withheld) in connection with phonograph records and audio-visual devices; (b) subject to any rights granted to third parties prior to the date hereof, no other person, firm or corporation shall have the right to use the Name or any other name that I may now or hereafter utilize or to permit it to be used in connection with phonograph records and audio-visual devices in the Territory; and (c) I have the authority, and have granted same to Producer, to use the Name or any other name that I may now or hereafter use as provided in the Agreement. During the term of the Agreement, I shall not abandon the Name specifically referred to in this paragraph 7 without Company's prior written consent.

8. (a) I hereby acknowledge and agree that each phonograph record master recorded under the Agreement embodying the results and proceeds of my services (individually a "Master" and collectively the "Masters") is a work made for hire in that (i) it is prepared within the scope of Producer's engagement of my exclusive personal services as a recording artist, or (ii) as one selection contained in a long-playing phonograph record album, it constitutes a work specifically ordered by Producer and Company for use as a contribution to a collective work. I further acknowledge and agree that Producer is the exclusive owner of all rights (including, but not limited to the exclusive copyrights) throughout the Territory in and to each such Master, including the "sound recording" (as defined in 17 U.S.C. Section 101) fixed therein (the "work") and the "phonorecord" (as defined in 17 U.S.C. Section 101) itself, as well as all "phonorecords" manufactured therefrom, and that Producer has the right to exercise all rights of the copyright proprietor with respect thereto, including but not limited to all exclusive rights specified in 17 U.S.C. Section 114(a).

M 00324
CONFIDENTIAL

any Work, I hereby grant and assign to Company all rights of any nature whatsoever (including, but not limited to the exclusive copyrights therein and thereto), throughout the Territory, in and to such Work, including but not limited to the exclusive rights specified in 17 U.S.C. Section 114.

9.  I hereby agree to indemnify and hold Company harmless from and against any liability, damage, cost and expense (including costs and reasonable attorney's fees) occasioned by or arising out of any claim, demand or action inconsistent with this inducement and any grants, representations, warranties or agreements herein which is reduced to final non-appealable judgment or settled with my written consent, which consent shall not be unreasonably withheld.  Company agrees to give me notice of any action to which the foregoing indemnity applies, and I may participate in the defense of same, at my expense, through counsel of my choice, provided that the final control and disposition of same (by settlement, compromise or otherwise) shall remain with Company.  I, at Company's request, will cooperate fully with Company in any controversy that may be brought by third parties concerning this inducement letter or any of Company's rights hereunder.  If I fail to consent to a proposed settlement, Company shall nonetheless have the right to enter into such proposed settlement, but, in such event, I shall not be liable for the amount of the settlement, but shall be liable for expenses (including costs and attorney's fees) that Company incurred up to and including the date as of which the claim is settled.  Alternatively, if I fail to consent to a proposed settlement and Company elects not to enter into such settlement agreement in accordance with the immediately preceding sentence, I shall thereafter directly bear all costs of defense and shall promptly reimburse Company for all costs incurred by Company (including costs and attorney's fees) up to and including the date which I failed to consent to the proposed settlement, and if I fail to promptly undertake such future costs, Company may settle such claim in its sole discretion and my indemnification shall apply to such settlement.

10.  I agree that my Producer Agreement(s) with Producer contains or shall be deemed to contain the following provision:

"This agreement is subject to assignment to Bellmark Records in accordance with the agreement between Producer and Bellmark Records dated as of March _30_th_, 1993, and Bellmark Records shall have the right to exercise, implement or enforce any rights granted to Producer hereunder on Producer's behalf.  In the event of a default by Producer in performing any of its obligations under this agreement, Producer shall not be deemed in breach of any of its obligations unless and until Artist shall send Producer specific notice by certified mail, return receipt requested, of the nature of such default and, simultaneously therewith, duplicate notices, in the same manner to Bellmark Records at 7080 Hollywood Boulevard, Suite 220, Hollywood, CA 90028, Attn: Al Bell, President and Bellmark Records and/or Producer shall have failed to cure such breach or commence curing such breach within sixty (60) days of its respective receipt of such written notice."

DM 00325
CONFIDENTIAL

03/24/93 Page - 5

11.   I grant to Company the right to license and/or assign the Producer Agreement and all and any of the rights granted thereunder to Company, including without limitation any and all of the rights and remedies granted to Producers thereunder, and further authorize such licensee or assignee to enforce the rights and/or remedies so granted directly in the name of such licensee or assignee.

12.   I hereby acknowledge and agree that I am obligated to record and deliver to Producer the number Masters equivalent in playing time of seven (7) albums during the Term of the Producer Agreement between Company and Producer.

13.   I hereby acknowledge and agree that all other terms and conditions of the Producer Agreement are in full force and effect except as expressly altered, amended, revised or changed by this Artist Inducement and Agreement.

14.   I UNDERSTAND THAT THIS IS AN IMPORTANT LEGAL DOCUMENT. I HEREBY REPRESENT AND WARRANT THAT I HAVE BEEN ADVISED OF MY RIGHT TO RETAIN INDEPENDENT LEGAL COUNSEL OF THEIR OWN CHOOSING IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THE PRODUCER'S CONTRACT AND OF THIS AGREEMENT AND THAT I HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAVE KNOWINGLY AND VOLUNTARILY WAIVED MY RIGHT TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO THIS AGREEMENT WITHOUT THE BENEFIT OF INDEPENDENT LEGAL REPRESENTATION.

Dated: As of  3-30-93

Steve Gibson

_____
Steve Gibson

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
_____
Social Security Number

The undersigned agree to be bound by the foregoing.

BELLMARK RECORDS, a division of Isbell Records, Inc.

By: _____
Its Authorized Agent

DM 00326
CONFIDENTIAL

Exhibit "B"

ASSIGNMENT OF COMPOSITIONS AND RIGHTS TO COPYRIGHT

Cecil Glenn p/k/a "D.C." and Steve Gibson individually, and
collectively d/b/a Tag Team
and
Tag Team Music, Inc.

and _____
(Writers)

(collectively "Assignors"),

for good and valuable consideration, receipt of which is hereby
acknowledged, the undersigned Assignors do hereby sell, assign,
transfer and set over unto Bellmark's affiliated designee publisher,
its successors and assigns, fifty percent (50%) of the entire rights,
title and interests throughout the world and universe, including,
without limitation, the copyrights and any registration and copyright
applications relating thereto, and any and all renewals and extensions
thereof and in and to all works based upon, derived from, or
incorporating the work covered by such copyrights, and in and to all
income, royalties, damages, claims and payments now or hereafter due
payable with respect thereto, and in and to all causes of action,
either in law or in equity for past, present, or future infringement
based upon said copyrights, and in and to all rights corresponding to
the foregoing throughout the world and universe, in and to the
following musical compositions which were written and authored by the
following indicated persons:

| Title | Writer(s) | Copyright Office Identification No. |
|---|---|---|
| Whoomp! (There It Is) | | |

and fifty percent (50%) of the right, title and interest of the
undersigned Assignors, vested and contingent therein and thereto,
subject to the terms and conditions of the Memorandum Agreement
between Assignors and Assignee dated effective _March  ___, 1993
and for the term of the copyrights and all renewals and extensions
thereof.

Assignors agrees that the Assignee(s) has the sole, exclusive
worldwide and universal right to administer and exploit the copyrights
and musical composition, to print, sell, dramatize, use and license
any and all uses of the copyrights and compositions, to execute in
Assignee(s)' own name any and all licenses and agreements whatsoever
affecting or respecting the compositions and copyrights, including but
not limited to licenses for mechanical reproduction, public
performances, dramatic use, synch uses and sub-publication, and to
assign or license such rights to others. This statement of exclusive
rights is only in clarification and amplification of the rights of
Assignee(s) and not in limitation thereof.

DM 00327
CONFIDENTIAL

The Assignors agree to execute any further documents and instruments (such as assignments or confirmations of ownership of copyrights) and do such other acts as may be reasonably necessary to fully effectuate the intents and purposes of this Agreement.

ASSIGNORS:

Cecil Glenn p/k/a "D.C." and Steve Gibson individually, and collectively d/b/a Tag Team
and
Tag Team Music, Inc.

X: _Cecil L. Glenn_____    X _Steb JH_____
Cecil Glenn p/k/a "D.C."         Steve Gibson

Tag Team Music, Inc.

By: _Steb JH_  _Vice Pres._
     (Name)      (Title)

_Cecil L. Glenn (President)_    _____
(Name)    Writer              (Name)    Writer

DM 00328
CONFIDENTIAL

EXHIBIT "C"
ASSIGNMENT OF MASTERS AND RIGHTS TO COPYRIGHT

Cecil Glenn p/k/a "D.C." and Steve Gibson individually, and
collectively d/b/a Tag Team
and
Tag Team Music, Inc.

for good and valuable consideration, receipt of which is hereby
acknowledged, hereby sell, assign and transfer to Bellmark, Assignee,
and its successors and assigns, absolutely and forever, all of
Assignor's rights, titles and interests of every nature, whether now or
hereafter known or existing, in and to (a) each and every multi-track,
2-track, 32-track digital and original session and master tapes and
recordings and all derivatives or parts thereof and sound recordings
identified in Schedule 1 attached hereto; (b) any and all artwork and
textual material to be used on or in conjunction with the packaging of
phonorecords or those sound recordings.  This assignment includes the
copyright and the right to secure the copyright on the sound recordings
embodied in the master tapes identified herein, and renewals and
extensions thereof throughout the world, together with all causes of
action for any and all previously occurring infringements of the rights
being assigned, and the right to use and retain the proceeds relating to
those infringements. The assignment is limited as set forth herein and
in no way pertains to the underlying musical compositions.

     This assignment is made in accordance with the Agreement between
Producer and Bellmark dated ___March 3__ , 1993, between
Assignors and Assignees.

Cecil Glenn p/k/a "D.C." and Steve Gibson individually, and
collectively d/b/a Tag Team
and
Tag Team Music, Inc.

x _Cecil L Glenn_____          x _Steh Sb_____
  Cecil Glenn p/k/a "D.C."           Steve Gibson

Tag Team Music, Inc.


By: _Cecil L Glenn  President____
    (Name)              (Title)

STATE OF GEORGIA    )
COUNTY OF ~~DeKALB~~  )SS.
          FULTON
     On this _3__ day of ___March__ , 1993, before me personally
appeared Cecil Glenn p/k/a "D.C." and Steve Gibson who executed the
within and foregoing instrument; known to me to be the persons who
executed the within instrument individually and on behalf of Tag Team
Music, Inc., and acknowledged they individually and on behalf of such
entity executed the same.

     WITNESS my hand and official seal.

My Commission Expires:

DM 00329
CONFIDENTIAL

## SCHEDULE 1

Cecil Glenn p/k/a "D.C." and Steve Gibson individually, and
collectively d/b/a Tag Team
and
Tag Team Music, Inc.

### Title of Master Recordings

1.  Whoomp! (There It Is)

DM 00330
CONFIDENTIAL

MECHANICAL LICENSE

Date:   September 19, 1997

DM Records
1791 Blount Road,  Suite 712
Pompano Beach, FL  33069

Composition:  ~~Daisey Duks~~ "DAzzey DUKS"

Words By: LA SNO/CREO-A
Music By: LA SNO/CREO-A
Artist:  Duice

Record No.: CD/CT 41307 'Booty Bass From Da Old School'

Release Date:  9/97                Timing:  < 5 Min.

Royalty Rate: 75% of Statutory w/7,500 Unit Advance

Gentleman/ Ladies:

We,  ALVERT MUSIC           , are the publisher who owns or
controls **100%** of the copyright or the mechanical recording rights
of the work listed above.

You have advised us, as publishers, that you wish to obtain a
non-exclusive license to make and to distribute phonorecords of
the copyrighted work, referred to above, under the compulsory
license provision of Section 115 of the Copyright Act of the
United States of America for the duration of the copyright,
including all renewals and extensions thereof.

You shall have all the rights which are granted to, and all
obligations which are imposed upon, users of said copyrighted
work under the compulsory license provision of the Copyright Act
after phonorecords of the copyrighted works have been distributed
to the public in the United States under the authority of the
copyright owner by another person, except that with respect to
phonorecords thereof made and distributed hereunder:

   1) You shall pay royalties and account to us, quarterly
within forty-five (45) days after the end of each calendar
quarter, on the basis of phonorecords made and distributed.  You
shall have the right to retain reasonable reserves against
charges, credits, or returns in the same manner as currently used
in your reporting to The Harry Fox Agency.

   2) For such phonorecords made and distributed, the royalty
shall be the rate stated above.

   3) Failure to render timely accountings or make timely
payments to us shall, if not cured by you within thirty (30) days
after written notice thereof from us, constitute a material

1

EXHIBIT C

breach of this l. ense entitling us, in ad .tion to our other remedies, to immediately terminate this license and all rights granted to you hereunder.  Such termination shall render either the making or the distribution, or both, of all phonorecords for which royalties have not been paid, actionable as acts of infringement under, and fully subject to, the remedies provided by the Act.  A waiver of any breach hereunder shall not constitute a waiver of any succeeding breach, whether similar or dissimilar.

4) Upon written request and during your regular business hours, you agree to make your books and records relating to the subject matter hereof available for audit by us.  Such audit shall not occur more often than once per year, nor more often than once per statement.

5) This license covers and is limited to the one particular recording of said copyrighted work as performed by the artist and on the phonorecord numbers set forth above; and this license does not supersede nor in any way affect any prior agreements now in effect respecting phonorecords of said copyrighted work.

6) You need not serve or file the notice of intention to obtain a compulsory license required by the Copyright Act.

7) This license is limited to the territory of the World.

8) All royalties are to be paid in the name of Al BELL records Jeanly (Tax ID#: 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 ).

9) This license may be sub-licensed or assigned by either party, and shall be governed by and construed under the laws of the State of Florida.


ACCEPTED AND AGREED TO:

DM Records


By _____
An Authorized Signer

1791 Blount Road
Suite 712
Pompano Beach, FL 33069


ALVERT MUSIC
c/o Bellmark Records


By _____
An Authorized Signer

7060 Hollywood Blvd.
Suite 1000
Hollywood, CA  90028-6015


2

**DM RECORDS, INC.**
1791 BLOUNT RD., STE. 712
POMPANO BEACH, FL   33069

NATIONSBANK
OF FLORIDA, N.A.
POMPANO BEACH, FLORIDA
63-243-670

3276

DATE   10 - 7 - 97

AMOUNT   $390. 94

PAY   Three Hundred Ninty and _____ 94/100

TO THE   AL BELL
ORDER
OF

⑈003276⑈ ⑆067002436⑆ 360359703 6⑈

10-12/97-1

** ROYALTY STATEMENT **

-- Mechanical --                                                    Page :    1

From: DM RECORDS, INC                          To: ALVERT 41306
      1791 BLOUNT RD. STE. 712                 Royalty Period: 10/97 - 12/97
      POMPANO BCH., FL 33069                   Beginning Balance :        0.00

| CATALOG | TITLE | LICENSE NUMBER | RATE | % STAT | OWNER SHIP | NET RATE | TOTAL UNITS | RE-SERVE | NET UNITS | LIQ. | AMOUNT DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DMR-41306.2 | DAZZEY DUKS | | 0.0695 | 75.000 | 100.000 | 0.0521 | 25074 | 6269 | 18805 | 0.00 | 980.21 |
| DMR 41306.4 | DAZZEY DUKS | | 0.0695 | 75.000 | 100.000 | 0.0521 | 11548 | 2887 | 8661 | 0.00 | 451.45 |

                                        Total Advances:                              0.00

                                               Total :   36622    9156   27466    0.00    1431.66
                              Outstanding artist balance:                             0.00

                                        Due this period:                          1431.66


EXHIBIT

-2

```
                              ** ROYALTY STATEMENT **
                              ==========================
                                   -- Mechanical --                                    Page :    1

        From: DM RECORDS, INC                             To: ALVERT 41307
              1791 BLOUNT RD. STE. 712                     Royalty Period: 10/97 - 12/97
              POMPANO BCH,, FL 33069                       Beginning Balance :    0.00
```

| CATALOG | TITLE | LICENSE NUMBER | RATE | % STAT | OWNER SHIP | NET RATE | TOTAL UNITS | RE- SERVE | NET UNITS | LIQ. | AMOUNT DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DMR 41307.2 | DAISBY DUKS | | 0.0695 | 75.000 | 100.000 | 0.0521 | 21431 | 5358 | 16073 | 0.00 | 837.81 |
| DMR 41307.4 | DAIZBY DUKS | | 0.0695 | 75.000 | 100.000 | 0.0521 | 8498 | 2125 | 6373 | 0.00 | 332.19 |

```
                                       Total Royalties:                                    1170.00


                   ADVANCES

DATE      COMMENT                   AMOUNT
-----------------------------------------------------------------------------
11/03/97  7500 UNIT ADV. FOR 75%STA    390.94


                                       Total Advances:                               390.94

                                          Total :    29929   7483   22446   0.00   779.06
                               Outstanding artist balance:                             0.00

                                       Due this period:                              779.06
```

-3-

** ROYALTY STATEMENT **

-- Mechanical --

From: DM RECORDS, INC
1791 BLOUNT RD. STE. 712
POMPANO BCH., FL 33069

To: ALVERT MUSIC
Royalty Period: 10/97 - 12/97
Beginning Balance : 0.00

| CATALOG | TITLE | LICENSE NUMBER | RATE | % STAT | OWNER SHIP | NET RATE | TOTAL UNITS | RE-SERVE | NET UNITS | LIQ. | AMOUNT DUE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DMR 41282.2 | DAZZEY DUKS | | 0.0695 | 75.000 | 100.000 | 0.0521 | 3179 | 1590 | 2747 | 1158.00 | 143.19 |
| DMR 41282.4 | DAZZEY DUKS | | 0.0695 | 75.000 | 100.000 | 0.0521 | 1414 | 707 | 1272 | 565.00 | 66.30 |
| DMR 41282.2 | WHOOMP (THERE IT IS) | | 0.0695 | 75.000 | 100.000 | 0.0521 | 3179 | 1590 | 2747 | 1158.00 | 143.19 |
| DMR 41282.4 | WHOOMP (THERE IT IS) | | 0.0695 | 75.000 | 100.000 | 0.0521 | 1414 | 707 | 1272 | 565.00 | 66.30 |

Total Advances: 0.00

Total : 9186 4594 8038 3446.00 418.98

Outstanding artist balance: 0.00

Due this period: 418.98