# EXHIBIT 1

Case 4:07-cv-00146-RAS   Document 267-1   Filed 09/07/12   Page 1 of 15 PageID #: 2965

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS - SHERMAN DIVISION

| | |
|---|---|
| ALVERTIS ISBELL d/b/a ALVERT MUSIC | |
| v. | CASE NO. 4:07-cv-00146-RAS |
| | (Judge Schell/Judge Bush) |
| DM RECORDS, INC. | |

EXPERT REPORT OF SAMUEL J. FOX, ESQ.

**Introduction and Background**

1. My name is Samuel J. Fox, Esq. I have been retained by DM Records, Inc. ("DM Records") to provide expert testimony in this case. My compensation for this work is $2,500, and, in addition, $495 per hour for any testimony associated with this work. The same hourly compensation will apply for any travel to the location of any deposition or trial.

2. Specifically, I was asked to opine on certain of the common and standard practices in the music industry insofar as they relate to the above referenced lawsuit and, as well, to each of the following: (i) practices in the music publishing industry regarding the transfer of copyrights of musical compositions; (ii) the distinction between copyright ownership and copyright administration (i.e., the administration of musical compositions); (iii) why copyright administration of musical compositions is such an important and distinctive right; and (iv) the nature and types of contractual relationships that exist between the creators of musical compositions and parties to whom they transfer what is commonly referred to as "music publishing rights." I will also opine on the issue of album credits, i.e., credits on what is referred to as an "album jacket," what they signify and what legal bearing they have.

## Qualifications and Bases of Opinions

3.  I am the president and principal of Fox Law Group, P.C., a Los Angeles based law firm that focuses on entertainment law. I have nearly 40 years of experience in which I have served as legal counsel representing music artists, songwriters, music publishers, record producers, record companies, and artist management companies. In addition to my legal experience, I was also the author and editor of the music portion of the ten volume set of form books entitled <u>Entertainment Industry Contracts, Negotiating and Drafting Guide</u>, which is published by Matthew Bender. The set, which includes Volumes 8 and 9 entitled "Music," are distributed worldwide and are an important part of the library of virtually every practitioner of entertainment law. I have attached my resume listing my legal experience, education, and written publications.

4.  In preparing this report, I have relied upon the knowledge and experience that I have gained through my legal career in the music industry, my research to author the above mentioned music law books, the legal resources that I cited within this report, and the following documents related to this case:

   a)  The co-venture agreement, dated July 17, 1992, between Bellmark and Tony Mercedes Records ("TMR") regarding the composition "Dazzey Duks;"

   b)  The Exclusive Producers Agreement, dated March 30, 1993 (including all attachments, schedules, and exhibits), between Bellmark Records, a division of Isbell Records, Inc. ("Bellmark") and Cecil Glenn p/k/a "D.C." and Steve Gibson individually, collectively d/b/a Tag Team, and Tag Team Music, Inc. ("Tag Team") regarding "Whoomp there it is";

   c)  The Asset Purchase Agreement between DM Records and the bankruptcy estate of Bellmark; and

   d)  The Copyright Assignment between, on the one hand, Mark A. Weisbart, Trustee, in his capacity as Chapter 7 trustee of, and on behalf of, the Bankruptcy Estate of Bellmark and, on the other hand, DM Records.

## Exclusive Rights of a Copyright Owner

5.      In order to understand how music industry practices and norms relate to this case, it is critical to start with the rights of a copyright owner, rights that are firmly set in the 1976 Copyright Act (and related amendments).  Section 106 of the Copyright Act delineates the exclusive rights[1] that a copyright owner has with respect to a copyrighted works and includes the right to do and *to authorize* the following: (1) the right to reproduce the copyrighted work in copies or phonorecords; (2) the right to prepare derivative works based upon the copyrighted work; (3) the right to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) the right, in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; (5) the right, in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and (6) the right, in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.[2]  Taken together, these rights encompass virtually all economically significant uses of copyrighted works,[3] and are often referred to as the "bundle of rights."  As noted below, this bundle of rights can be divided even further into what is sometimes referred to as "sticks in the bundle" and this takes on a particular importance in analyzing this case in the context of music industry standards.

---

[1] Subject to specific limitations enumerated in 17 U.S.C. §§ 107 - 122.

[2] 17 U.S.C. § 106

[3] 2 Paul Goldstein, Goldstein on Copyright, 7:2 (3rd ed. 2007)

## Transfers of Copyright Ownership

6.   The Copyright Act provides that copyright ownership (and thus the "bundle of rights) may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.[4]

7.   A transfer of ownership in a copyright is governed by the Copyright Act's statute of frauds, and thus a clear writing is required to effect valid transfer.[5]  The express wording of Section 204(a) of the Copyright Act states that "[a] transfer of copyright ownership, other than by operation of law, is not valid, unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."[6]  The underlying rationale of this Section is that, without evidence of a written transfer of assignment, it would be difficult, if not impossible to determine who owned a copyright in which ownership was contested.

8.   Not only may a copyright be transferred, but each of the exclusive rights in the work (individually referred to as "sticks in the bundle"), may be divided up into as many parts as the copyright owner desires[7] and those may be transferred as well.  These "sticks" may be owned and protected separately pursuant to the Copyright Act [8] and if any are transferred, the transferee then is _authorized_ to exercise the exclusive rights of copyright ownership as to those "sticks." Music industry standards suggest that it would be unusual and rare for any of these "sticks" to be transferred without a written agreement.

---

[4] 17 U.S.C. § 201(d)(1)

[5] Goldstein, 5:6

[6] 17 U.S.C. § 204(a)

[7] Richard Schulenburg, Legal Aspects of the music Industry, 503 (2005)

[8] 17 U.S.C. § 201(d)(2)

9. In the music publishing industry, when an agreement provides for the "transfer of copyright," then unless the agreement evidencing the transfer expressly withholds certain rights to the bundle of rights, or unless one of those "sticks" has previously been granted to another, it is customary for the transfer to include all of the exclusive rights (i.e., the entire bundle) of the copyright owner. However, the converse of that statement is not true, i.e., the transfer to a transferee of any one or more right included in the bundle of rights (i.e., one or more "stick") does not necessarily mean or imply that the underlying copyright itself is transferred to the transferee. This distinction is perhaps most evident in the music publishing industry where a clear distinction is made between copyright ownership and copyright administration. As set forth below, in that instance, the right to administer a copyright may be granted to another, with the transferor retaining the copyright ownership interest.

### "Administration Rights" in Copyright

10. Within the music publishing industry, i.e., the industry built around the ownership and exploitation of musical compositions, the right to administer a musical composition (as opposed to the right to own the song copyright) has become critically important and a very big business due to logistical issues resulting from the worldwide exploitation of music. With songs no longer being limited to territorial borders and the concept of songs becoming "worldwide hits," a very obvious "stick in the bundle" grew out of the complexity of overseeing, collecting and managing the monies to which the song owner was entitled from the successful exploitation of a song.

11. In brief, the exploitation of musical compositions can generate revenue for the copyright owner from a variety of sources including: (i) the public performance of the music composition (e.g., on radio and television and in concerts); (ii) the sale of phonorecords embodying the musical compositions; (iii) foreign translations of the musical

composition; (iv) the inclusion of the musical composition in television programs, films, videogames and on internet programs; and (v) the sale of print copies of the songs.

12. With exploitations of songs occurring all over the world and on all forms of media, it has become virtually impossible for an individual copyright owner to track all of the exploitations of a particular song, especially if the song is popular and considered to be a "hit." Revenue flows from every country, from foreign record labels and from foreign performing rights societies. Thus the need for a professional administrator, someone who is equipped with the expertise and experience, as well as the infrastructure, to locate, track, collect and transfer the monies that are generated from the exploitation of song. Copyright administration for musical compositions is a big business and the music publishing industry has responded by offering copyright proprietors the ability to get their songs administered so that the copyright owner can be fairly compensated for the exploitation of the owner's musical compositions.

13. Within the music publishing industry, these administration rights came to define situations where a copyright owner does not wish to give up ownership of a song or group of songs, but does want to be relieved of the administrative burden of dealing with songs.[9] Thus, language describing and evidencing a copyright owner's transfer of "Administrative Rights" is meant solely to transfer administrative duties and not to transfer any form of copyright ownership to the named administrator.

14. Administration agreements are typically written forms; it would be the rare exception to find an oral administration agreement due to the number of issues that arise in connection with this transaction, from the administration fee charged, to the territory covered, and to somewhat complex accounting issues such as what is commonly referred to

---

[9] Evan Medow and Alan H. Kress, Co-Publishing and Administration, in 9 Entertainment Industry Contracts, 173-92 (Donald C. Farber & Peter A. Cross eds., LexisNexis 2008)

as funding "at the source." Also, as with any grant of contractual rights, a term for the agreement must be negotiated. Currently, the term for Administration Rights is generally two to three years with perhaps one or two options.[10] It is rare for a term to exceed five years and rarer still for any administrator to be granted Administration Rights for the "life of copyright."

### Industry Practices and the Agreements in this Case

15. Based upon music industry standards coupled with my experience and knowledge in the music industry, I find that the agreements entered into by Bellmark are agreements that were commonly used in the music industry for what I refer to as "smaller record companies," i.e., companies that were not owned by the major labels (e.g., Sony, Warner Bros., etc.). These smaller companies operated by their own rules and, more often than not, were less favorable to the artists than the agreements provided by major companies.

16. The language within the Exclusive Producers Agreement clearly effectuated a transfer of fifty percent (50%) ownership in and to the copyright of the musical composition "Whoomp there it is," and the co-venture agreement clearly effectuated a transfer of one-third (1/3) ownership to the copyright of the musical composition "Dazzey Duks." This portion of the written transaction is referred to as the co-publishing portion of the agreement, i.e., the proprietor of the copyright transfers to transferee a percentage (less than 100%) of the copyright to the composition.

17. The primary question raised in this case is the identity of the party to whom the above described ownership and administration rights interests were granted; here, such party is referenced in the agreement as the "publishing designee" of Bellmark. For an answer to that question, it is critical that we look at industry custom and practice,

---

[10] Medow and Kress, 9 Entertainment Industry Contracts, 173-98.

particularly in two specific areas, i.e., (i) customary practices of music publishing companies in acquiring music publishing rights and (ii) customary practices of record companies in acquiring music publishing rights from their recording artists.

i.) <u>Customary Practices of Music Publishing Companies in Acquiring Music Publishing Rights</u>. Virtually without exception, all music publishing companies desiring to purchase copyrights of compositions will use a separate copyright assignment form or a publishing (or co-publishing) agreement for that purpose. The parties to that agreement are the music publisher and the party who is transferring a copyright interest in the compositions. There is consideration given to the transferor, typically a payment and an on-going royalty, and, in return, the music publishing company obtains all or a portion of the copyright and, very often, the right to administer the composition. Clearly Bellmark chose not to use the assignment or separate publishing agreement, although those forms were certainly available to Bellmark and its counsel at the time. Whether that was because Bellmark had no separate affiliated publishing company or it desired for the songs to be owned by Bellmark or any other reason is not known to the undersigned.

ii.) <u>The Customary Practices Of Record Companies in Acquiring Music Publishing Rights From Their Recording Artists</u>. At the time of these agreements, common practice in the music industry was determined, in part, by the size of the record company that was signing the artist. Larger record companies, such as Sony Music and Warner Bros., facing competition with each other for top artists, typically signed artists solely as "recording artists," i.e., solely for the purpose of recording them for records. For practical reasons, they did not want to be accused of trying to use their leverage to force an artist to have to give up any of part of the artist's copyright interests in the songs. Thus, even though these large record companies had separate music publishing arms which would have loved to sign the artists to publishing deals, the record companies rarely

demanded that the artists transfer some or all of their music publishing interests to themselves or to their affiliated music publishing entities. Artists signing recording agreements with the major labels had a choice of what they wanted to do with regard to their publishing rights: some signed separate publishing or co-publishing agreements with the affiliated music publishing company simply because they liked what was offered to them; others refused to sell their music publishing rights; others went to other unaffiliated companies to transfer some or all of their copyrights; and yet others entered into administration agreements.

18. Unlike the customary practice of the larger record companies, it was common industry practice for smaller independent record companies, such as Bellmark, to demand an ownership interest in the copyrights of the musical compositions written by the recording artists. The companies used their leverage to require an artist to sign an agreement which tied the artist both as a recording artist and also took ownership (or partial ownership) of the music publishing. This became the model for most smaller labels, particularly in the genre of music of the subject musical compositions. These smaller companies wanted to own not only the recordings, but they wanted to own the songs too. In order to accomplish this goal, the smaller record companies had a choice - they could include the transfer of song copyrights in the body of their recording agreements (as noted above) or they could ask the artist to sign a separate publishing agreement. By including the copyright transfer in the artist's recording agreement, a clear statement was made, i.e., Bellmark was not intending that the copyright be assigned to a specific third party, but rather to itself (and possibly its subsequent assignee). There is no way to know its reasoning; perhaps Bellmark did not want to have to bother with separate music publishing agreement. A separate publishing entity was often an afterthought to a smaller label, either because it did not exist at the time of the transaction or because the smaller record

company did not want to bother with the hassle and the formalities of using multiple agreements and entities to tie up its rights. By including the grant in the recording agreement, the songs were owned by the record companies unless a specific third party publisher was named. Here, based on custom in the industry, Bellmark would have taken ownership of both the recordings and the copyrights of the songs. The lack of a specifically named designee would not negate the intent to own those rights by virtue of Bellmark's position as the record company. That was how business was (and is) done. The co-venture agreement and Exclusive Producers Agreement were bilateral agreements between TMR and Tag Team, respectively and Bellmark; not with an unnamed designee. Industry standards of the time would dictate the transfer of the copyrights to have been to Bellmark and not some unidentified and unknown affiliate, particularly one that may not have even been formed at the time. Bellmark, in turn, would have had the right to transfer its rights to a designee, but the designee's rights actually would have flowed through Bellmark.

19.     Even if a separate written administration agreement did exist between Bellmark and some third party entity, industry custom would suggest that the agreement would relate to Administration Rights only and not any transfer of a copyright ownership right. Otherwise the agreement would be a copyright assignment or co-publishing agreement. Furthermore, based on industry custom, the administration agreement would have a term that would probably not exceed three to five years. It is rare to find any administration agreement that runs the length of copyright and, if one existed, the rationale and consideration would be evident and significant.

### Album Credits

20.     The issue of album credits and their probative value is worthy of a comment. With a few notable exceptions regarding the title of the album, the name of the record company, the copyright credits and, perhaps, the name of the key producers of the album ,

the issue of credits for an album jacket is often more rooted in personal taste and self-serving statements than it is in the law. Industry custom for established record companies typically result in at least two copyright notices on the outer album jacket, one for the artwork of the album jacket and one for the sound recordings embodied on the phonorecord. They are typically found at the bottom of the back lower left corner of the album jacket. However, there are times when a copyright notice for the songs is also included on the album jacket. These song copyright notices are typically found on album inserts or on the inside cover of the album jackets where there is room to list the various music publishers and the individual writers of the songs, but that's not always the case and they could appear on an album jacket.

21.   As any person who works in the music industry well knows, all other credits are gratuitous at best. There is no "one way" to do album jacket credits and often the task is left to the art department of a record label and the executives at the label. There are really no checks or balances to correct an error, especially if the artist does not have a stake in the credit. Thus, a credit listing a person as the administrator of the songs on an album is, by itself, without any legal significance. After all, who is going to object or comment when the proprietor of the label which owns the copyrights of the compositions lists itself or its alter ego as the administrator?

## Conclusion

22.   Industry custom is not intended to be a substitute for the facts or the law. At best, it is a mirror intended to reflect common usage so that behavior can be judged against what is considered to be a norm. In the present case, industry custom provides that when a music publisher wants to acquire a copyright right, it will use an assignment form or a publishing agreement. That said, smaller record companies often sought a transfer of copyright interest in musical compositions by including assignment provisions in their

recording contracts, thus ignoring the separate publishing agreement. The result of doing that was that the record company, as the signatory to the recording agreement, became the owner of the copyright. Industry custom also caused many artists to include a grant of administration rights along with their transfer of copyright, particularly where the transfer is from an artist to a company that may be better equipped to handle the administrative chores involved with music publishing and the collection of music publishing income.

23. On the other hand, a grant of administration rights has no legal significance in terms of copyright ownership. Industry custom also provides that where there is a separate grant of administration rights, that grant is typically made pursuant to a written agreement and is often for a term of between three and five years. Lastly, industry custom has demonstrated that the use of album credits is not the legal basis to prove a claim of administrative rights in the songs embodied in the album. It is only an indication that the person overseeing the credits has made a determination for himself or herself that may or may not be accurate.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on August 17, 2011, at Sherman Oaks, California.

_____
SAMUEL J. FOX, ESQ.

# Samuel J. Fox, Esq.

**EXPERIENCE**

**Fox Law Group, P.C.**                                Sherman Oaks, CA
<u>President</u>                                             1999–Present
- President and principal of Los Angeles based law firm focusing on entertainment and business law.
- Practice includes all areas of entertainment and the entertainment business including music, television, motion pictures, the internet and mobile technologies. Clients include creators, artists, producers, songwriters, and companies and businesses and their intellectual properties.
- Our firm handles all transactional matters including traditional entertainment industry contracts, formation of ventures, copyrights, licensing and the development and implementation of business strategies.

**Blanc, Williams, Johnston, and Kronstadt LLP**       Century City, CA
<u>Of Counsel</u>                                            1988–1999
- The firm's focus was intellectual property and particularly internet companies in the software industry. The firm also handled all transactional matters including traditional entertainment industry contracts, copyrights, and licensing

**EDUCATION**

**NYU School of Law**                                  New York, New York
Juris Doctor

**Cornell University**                                 Ithaca, New York
Bachelor of Arts

**PUBLICATIONS**

Editor and Author, <u>Entertainment Industry Contracts; Negotiating and Drafting Guides</u>, Volumes 8 and 9.

**MEMBERSHIPS**

- California State Bar Association

- NARAS (National Recording Academy of Arts & Sciences)
- Diabetes Research Institute, University of Miami , Former National Board Member