**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| Alvertis Isbell d/b/a Alvert Music, | |
| Plaintiff, | |
| v. | Case No. 4:07-cv-00146-RAS (Judge Schell/Judge Bush) |
| DM Records, Inc., | |
| Defendant. | |

---

## PLAINTIFF ALVERTIS ISBELL'S TRIAL BRIEF

---

Plaintiff Alvertis Isbell d/b/a Alvert Music respectfully submits this Trial Brief and states as follows:

The meaning of the Agreements, at issue in this matter, is a matter of law and must be determined by the Court. Further, Defendant DM Records, Inc.'s ("DM") theories of alter ego and that DM became a co-owner of the composition "Whoomp! (There It Is)" through the purchase of Emergency Music's purported share of the composition, "Whoomp! (There It Is)," are barred as a matter of law. Finally, Isbell asserts DM's claim that Isbell is barred from seeking relief because of the doctrine of equitable estoppel is wrong and should be determined as a matter of law.

### Statement of Facts

**I. Alvert Music's Acquisition of "Whoomp! (There It Is)" and "Dazzey Duks."**

In July 1992, Isbell Records, Inc. d/b/a Bellmark Records ("Bellmark") entered into a co-venture deal with Anthony Johnson and B.T.J. Inc., d/b/a Tony Mercedes Records ("TMR"). Pl. Ex. 137. In reference to "Controlled Compositions" under the contract, the agreement states:

> The copyright of the Controlled Composition entitled "Dazzey Duks" will be divided equally between your affiliated publishing company yet to be formed, Gigolo Chez Publishing and **Bellmark's affiliated publishing company** (1/3 share each) and shall be administered by Bellmark's publishing company or designee.  The copyrights of all other Controlled Compositions of songs released through this Co-venture will be divided equally between your affiliated publishing company and **Bellmark's affiliated publishing company** and shall be administered by Bellmark's publishing company or designee.

Pl. Ex. 137 (emphasis added).

In March 1993, Bellmark entered an "Exclusive Producers Agreement" with Cecil Glenn p/k/a D.C. and Steve Gibson, individually, and collectively d/b/a Tag Team, and Tag Team Music, Inc ("Tag Team Agreement").  Pl. Ex. 146  Exhibit B to that agreement is titled "Assignment of Compositions and Rights to Copyright."  Pl. Ex. 146  Exhibit B states:

> [T]he undersigned Assignors do hereby sell, assign, transfer and set over unto **Bellmark's affiliated designee publisher**, its successors and assigns, fifty percent (50%) of the entire rights . . . the copyrights and any registration and copyrights applications relating thereto, and any and all renewals and extensions thereof and in and to all works based upon, derived from or incorporating the work covered by such copyrights . . . to the following musical compositions which were written and authored by the following indicated persons:
>
> Whoomp[]! (There It Is)

Pl. Ex. 146  (emphasis added).  The contract goes on to transfer a portion of all the composition copyrights for songs written under the terms of the agreement.  Pl. Ex. 146

Alvert Music, not Bellmark, then registered "Whoomp! (There It Is)" with Broadcast Music, Inc. ("BMI").  Pl. Ex. 56.  Thereafter, Isbell, through Alvert Music, began exploiting the compositions owned individually by him and administered the other publishers' ownership interests through Alvert Music.

Before Bellmark's bankruptcy, Isbell was engaged in licensing the compositions, "Dazzey Duks" and "Whoomp! (There It Is)."  In 1995, Isbell licensed the compositions for both "Dazzey Duks" and "Whoomp! (There It Is)" to DM.  Pl. Ex. 339, 340.

2

Further, Isbell continued to license the compositions following Bellmark's filing for bankruptcy.  On September 19, 1997, DM Records entered into a contract with Alvert Music which gave DM Records a mechanical license for the song "Dazzey Duks."  Pl. Ex. 19.  The license was signed by Al Bell and DM Records' President, David Watson.  Pl. Ex. 19.  The license states "We, Alvert Music, are the publisher who owns or controls 100% of the copyright or the mechanical recording rights of '[Dazzey Duks].'"  Pl. Ex. 19.  The license states all royalties are to be paid in the name of Al Bell (social security XXX-XX-2297).  Pl. Ex. 19.

DM Records sent at multiple royalty statements to Alvert Music which were paid under his personal social security number.  *See* Pl. Ex. 36, 37, 41.

This is exactly consistent with how other major companies licensed the compositions from Alvert Music.  *See* Pl. Ex. 25, 60, 71, 81, 91, 99, 134, 135.

**II.     Bellmark Records Files for Bankruptcy Protection.**

On April 18, 1997, Bellmark asked for Chapter 11 Bankruptcy relief.  Doc. 1.  On January 18, 1998, Bellmark's bankruptcy was converted to a Chapter 7 proceeding.  Doc. 1.

On October 4, 1999, DM Records purchased Bellmark's assets through the bankruptcy court.  The sale was an "as is where is" sale.  Doc. 1.

**III.     Emergency Music Brings Suit Against Isbell.**

Prior to and during the Bellmark bankruptcy, Emergency Music, Inc. sued Alvertis Isbell d/b/a Alvert Music and Bellmark for copyright infringement, arguing the composition "Whoomp (There It Is)" infringed on a song owned by Emergency Music by virtue of "Whoomp" containing an interpolation of the Emergency-owned composition "I'm Ready."  *Emergency Music, Inc. v. Isbell*, No. 95 Civ 5182, 1998 U.S. Dist. LEXIS 8832, at *1 (S.D.N.Y. June 15, 1998).  The case was stayed against Bellmark because of Bellmark's bankruptcy.  *Id.*  The case

was allowed to proceed against Isbell d/b/a Alvert Music. *Id.* A Southern District of New York Court awarded Emergency Music more than $600,000 against Isbell finding him liable for direct compositional copyright infringement. *Id.* at *12. The finding of direct copyright infringement necessarily required a finding that Isbell licensed and exploited the composition copyright in "Whoomp! (There It Is)" in his own person.

### IV. DM Records Wrongfully Begins Holding Itself Out as Owning Composition Copyrights and Isbell files Suit to Protect His Personal Property.

Sometime after the purchase of Bellmark's assets, DM Records began licensing the composition copyrights owned by Alvert Music. On July 3, 2002, Isbell filed a Complaint, in the Northern District of Texas, asserting copyright violations against DM Records. Doc. 11. Isbell asserts he owns certain composition copyrights and DM Records is infringing against those rights. Doc. 11. In addition, Isbell seeks a declaratory judgment that he owns the copyright compositions. Doc. 11. DM Records claims it purchased these composition copyrights during the Bellmark bankruptcy. Doc. 119.

Eventually, the case was transferred to the Eastern District of Texas Bankruptcy Court. Doc. 1 ¶ 17. That court was asked whether it had previously decided if Bellmark or Alvert Music owned the composition copyrights in question. Doc. 1 ¶ 20. The bankruptcy court held:

> The Court has not previously determined whether the Debtor[, Bellmark,] owned the Subject Compositions, because the sale of the Debtor's assets was without representations or warranties as to title. This Court's orders do not govern the parties' present dispute.

Doc. 1. ¶ 40. Following the ruling by the Bankruptcy Court, the case moved back to the Eastern District of Texas. Docs. 1, 11. The district court then adopted the Report and Recommendation of the Bankruptcy Judge without objection from DM Records. Doc. 7.

<u>**Argument**</u>

I.      **The Plain Language of the Agreements Means the Issue of Contract Interpretation Must be Undertaken by The Court as a Matter of Law.**

A.  **California Law Applies to the Contract Dispute.**

This brief addresses two contracts, with Alvert Music being the intended third-party beneficiary of both: the TMR and Tag Team Agreements.  Both contracts state they are governed by California law.[1]  Pl. 136, 147.  California law is clear on how contracts regarding third party beneficiaries should be treated.

B.  **The Plain Language of the TMR and Tag Team Agreements Demonstrate Alvert Music Owned the Composition Copyrights to "Dazzey Duks" and "Whoomp (There It Is)."**

Under California law, "[a] third party beneficiary may enforce a contract made for its benefit."  *Hess v. Ford Motor Company*, 41 P.3d 46, 51 (Cal. 2002) (citing Cal. Civ Code § 1635).  It is not necessary for a third party beneficiary to be specifically named in a contract. *Galardi Group Franchise & Leasing LLC v. City of El Cajon*, 125 Cal. Rptr. 3d 394, 400 (Cal Ct. App. 2011) (citing *Neverkovec v. Fredricks*, 87 Cal. Rptr. 2d 856, 865 (Cal Ct. App. 1999)).

"'[A] putative third party's rights under a contract are predicated upon the contracting parties' intent to benefit' it."  *Hess*, 41 P.3d at 51 (quoting *Garcia v. Truck Insurance Exchange*, 582 P.2d 1100 (Cal. 1984)).   Intent is determined using ordinary principles of contract interpretation.  *Id.* (citing *Garcia*, 582 P.2d 1100).  Contracts must be interpreted "'to give effect to the mutual intention of the parties as it existed **at the time of contracting**.'"  *Id.* (emphasis added) (quoting *Neverkovec*, 87 Cal. Rptr. 2d 856).  When possible the parties' intentions should be determined by the writing itself; however, "'[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates.'"  *Id.* (quoting Cal.

---

[1] While there are other Agreements at issue in this case there is no dispute those Agreements use the same operative language and have the same effect.

Civ. Code § 1647).  "When the interpretation of a contract does not turn upon the credibility of extrinsic evidence . . . interpretation is purely a judicial function to be exercised according to the generally accepted canons of interpretation.  *Martin Bros. Construction, Inc. v. Thompson Pacific Construction, Inc.*, No. C058944, 2009 Cal. App. LEXIS 1951, at *8 (Cal. Ct. App. Dec. 4, 2009).

There is no question the plain language of the contracts transferred the copyright compositions.  DM claims the contracts transferred the compositions in such a way that they were included in the Bellmark bankruptcy.  Isbell claims the contracts transferred the compositions to his d/b/a Alvert Music.  There is no question that the contracts transferred the composition copyrights to "Bellmark's affiliated publishing company" and "Bellmark's affiliated designee publisher" respectively.  As Alvert Music was Bellmark's affiliated publisher at the time, there should be no question that the publishing was transferred to Alvertis Isbell d/b/a Alvert Music.

1.  **The TMR Agreement's Plain Language Means Alvert Music Owns the Composition Copyright for "Dazzey Duks."**

The TMR and Tag Team Agreements are clear: when Bellmark is acquiring something, the contracts so provide, but, when someone else other than Bellmark is acquiring something under the contracts, the language is equally clear.  With respect to the songs involved in this dispute, the language of the contracts is clear: Alvertis Isbell was being assigned the musical compositions and Bellmark was not.  There is no ambiguity that "Bellmark's affiliated publisher" and "Bellmark's affiliated designee publisher" are separate and apart from Bellmark itself and the Court must rule as a matter of law on this issue.

First, the TMR contract contains a number of references to Bellmark's rights and obligations under it.  On page 1 of the contract, the "Purpose" paragraph states "Bellmark agrees

6

to provide you manufacturing, world-wide distribution, marketing services and/or selling of records of "Duice." Pl. Ex. 137. In dealing with trademarks, the contract states "Bellmark expressly agrees that the Tony Mercedes Records trade name, trademark and logo is and shall remain the sole and exclusive property of TMR and TMR agrees Bellmark shall be granted a license." Pl. Ex. 137  In dividing profits realized from the sale of recordings the contract states "We agree to pay to you one-half (1/2) of the Gross Profit." Pl. Ex. 137. In dealing with existing product, the contract states:

> Upon execution of this this [sic] agreement, all such remaining inventory shall be transferred to Bellmark's distribution facility in Atlanta, GA. All proceeds from the sales of this existing inventory so transferred shall be remitted by Bellmark to you upon receipt of said proceeds by Bellmark.

Pl. Ex. 137 at 2. The contract contains numerous other references to "Bellmark" and two references to "Isbell Records, Inc." When Bellmark had a right or obligation under the terms of the contract, the contract used the terms "Bellmark," "Isbell Records, Inc.," "us," or "we." When the contract gave an entity the copyright composition "Dazzey Duks," however, it did not use the terms "Bellmark," "Isbell Records, Inc.," "us," or "we." Instead the contract then used the term "Bellmark's affiliated publishing company." Pl. Ex. 137.

There is no dispute that DM Records bought an ownership in certain masters owned by Bellmark through the bankruptcy court. There is no dispute because the TMR Agreement states "[y]ou agree to assign and transfer to us an undivided one-half (1/2) interest of your right, title and interest in all master recording you make, record or produce which Bellmark/Life accepts." Pl. Ex. 137. This clearly shows Bellmark owned that interest in the contract.

Bellmark knew how to say it got an ownership interest in copyrights. However, when the contract deals with composition copyrights, Bellmark did not state it had an interest. Instead, that interest was given to "Bellmark's affiliated publishing company." Pl. Ex. 137. This

language indicates an intent to transfer the composition copyrights, not to Bellmark, but to a third party, the affiliated publishing company.  Later in the contract, when dealing again with composition copyrights, the contract does not say Bellmark, but instead states "[y]our affiliated publishing company shall make appropriate assignments of the songwriter agreements to Bellmark's affiliated publishing company," not to Bellmark.

**2.   The Tag Team Agreement Clearly Transfers the Composition Copyright for "Whoomp (There It Is) to Alvert Music.**

The March 30, 1993 "Exclusive Producers Agreement" between Tag Team and Bellmark also shows Bellmark's ability to refer to itself in a contract and its intention to transfer composition copyrights to a third party.  Pl. Ex. 146.  The first mention of Bellmark in the contract is found in its second paragraph, "[t]his will also confirm the agreement between you and Bellmark Records ('us', 'we', 'our' or 'Company') with respect to your services as an arranger and record producer."  Pl. Ex. 146.  When this contract granted Bellmark the master recording copyrights made under its terms, it states "we shall own in perpetuity, throughout the universe, all rights of every kind and character in the musical materials and results and proceeds of your services rendered hereunder and, all works including the Masters, prepared hereunder shall be considered as Works (including the Masters) made for hire on our behalf."  Pl. Ex. 146.  The contract also deals with master recording copyrights created by "accepted artists" stating:

> During the term, you shall exclusively offer to Company all masters which are available for distribution in the Territory (throughout the world and entire universe) or any part thereof, (A) produced by or for you during the Term and/or (B) obtained and/or owned and/or controlled, directly or indirectly, in whole or in part, by you during the Term and/or licensed to or otherwise acquired by you during Term.

Pl. Ex. 146 at 2.

The contract uses different terms when it deals with the "ASSIGNMENT OF COMPOSITION AND RIGHTS TO COPYRIGHT." Pl. Ex. 146 at Ex. B.  Instead of granting these rights to Bellmark, the contract states:

> [T]he undersigned Assignors do hereby sell, assign, transfer and set over unto **Bellmark's affiliated designee publisher**, it successors and assigns, fifty percent (50%) of the entire rights, title and interests throughout the world and universe, including without limitation, the copyrights and any registration and copyright applications relating thereto, and any and all renewals and extension thereof and in and to all works based upon, derived from, or incorporating the work covered by such copyrights, and in and to all income, royalties, damages, claims and payments now or hereafter due.

Pl. Ex. 146 (emphasis added).

The difference in the language of the contract indicates that the composition copyrights were not assigned to Bellmark, but instead were granted to a third party.  "A fundamental rule of construction is that a court must give effect to every word or term employed by the parties and reject none as meaningless or surplusage in arriving at the intention of the contracting parties." *United States v. Hathaway*, 242 F.2d 897, 900 (9th Cir. 1957); *see also Khouw v. Methodist Hospitals of Dallas*, 126 Fed. Appx. 657, 659 (5th Cir. 2005).  When rights are granted to Bellmark, the contract says Bellmark; when rights are granted to a third party, Alvert Music, the contract says "Bellmark's affiliated designee publisher."  The parties used two different terms two refer to two different entities receiving rights.  If Bellmark had been granted these composition copyrights, the contract would have used the language it used to grant Bellmark the master recording copyright.  Interpreting the contract in a way that ignores the use of these two different terms rejects the term "Bellmark's affiliated designee publisher" as meaningless or surplusage and cannot stand as a matter of law.

This, separation between Bellmark and its affiliated publisher, is further evidenced by the "GRANT OF POWER OF ATTORNEY" contained within the contract. Pl. Ex. 146. That provision of the contract states:

> You and Accepted Artists and Writers . . . hereby irrevocably and coupled with an interest, constitute, authorize, empower and appoint **Company and its affiliated designee publisher** or any of their agents and officers your, Accepted Artists' and Writers' true and lawful attorneys . . . to take and do such action, and to make, sign, execute, acknowledge and deliver any and all instruments and/or documents, which **Company and/or it's [sic] affiliated designee publisher** from time to time may deem desirable or necessary to effectuate the intents and purposes of the 'Grant of Rights' and 'Sale and Assignment of Masters' and 'Mechanical Copyrights; Controlled Compositions' provisions hereof and to accomplish, evidence and to perfect the rights granted to **Company and it's [sic] affiliated designee publisher** to vest in Company, its successors and assigns and Company's affiliated designee publisher, its successor and assigns, exclusively, perpetually and throught the world and universe, all the rights, title and interests granted by you . . . under this Agreement.

Pl. Ex. 146 at 14 (emphasis added). This language obviously contemplated that Bellmark and "Bellmark's affiliated designee publisher" are two separate entities. If Bellmark was its "affiliated designee publisher" or if it owned its "affiliated designee publisher" it would only need the power of attorney granted to Bellmark. Instead, because Bellmark and "Bellmark's affiliated designee publisher" were separate entities, with separate copyright ownership interests, it was necessary to grant power of attorney to both entities so that those rights could be enforced. Bellmark owned the sound recording (master) copyrights and needed to be able to protect those copyrights. "Bellmark's affiliated designee publisher" owned the composition copyrights and needed to be able to protect those copyrights.

Further, the existence of this Controlled Composition language shows Bellmark was not the owner of the musical composition rights. An owner does not need a license to exploit a copyright. Co-owners of compositions cannot be liable to each other for infringement. *See Quintanilla v. Texas Television, Inc.*, 139 F.3d 494, 498 (5th Cir. 1998). Thus, if Bellmark

10

owned the composition it would not have needed a license and would not have drafted one into its agreements.

This is also demonstrated by the difference in how the masters and the compositions are treated under the contracts.  For instance paragraph 10 of the contract controlling for "Whoomp! (There It Is)" defines how royalties shall be paid for master recordings.  Pl. Ex. 146.  The contract provides explicitly for how royalties shall be paid regarding the master recordings.  DE 153, Ex. F ¶ 10.  Nowhere in that paragraph or anywhere else in the contract is Bellmark granted a license to exploit the master recordings.  Pl. Ex. 146.  No license is needed because paragraph 13(a) grants the master recordings to Bellmark.  Pl. Ex. 146.  Owners of master recordings do not need a license to exploit those recordings.

Likewise, owners of composition copyrights do not need a license to exploit composition copyrights.  Bellmark needed a license to exploit the "Whoomp! (There It Is)" composition because it did not own that composition.  Paragraph 18 of the contract explicitly licenses to Bellmark the compositions controlled by the contract, including "Whoomp! (There It Is)."  Pl. Ex. 146.  That license is necessary because Bellmark does not own the Compositions.  The Compositions are owned by Isbell through his d/b/a Alvert Music.

The contracts are clear that the compositions are transferred to a third party and the Court must rule on this issue as a matter of law.

**C.  As a Matter of Law the Parties to the Contracts Intended to Benefit Alvert Music.**

The plain language of the contracts establish "Bellmark's affiliated publishing company and "Bellmark's affiliated designee publisher" are separate from Bellmark.  While the plain language of the contract, in a vacuum, does not establish who "Bellmark's affiliated publishing company" and "Bellmark's affiliated designee publisher" are, there is no real dispute between

the parties on this point.  Mark Watson the President of DM Records has admitted Alvert Music was Bellmark's affiliated publisher.  The plain language in the TMR and Tag Team Agreements that the composition copyrights were transferred to a third party publishing company combined with the historical fact that Alvert Music was the publishing company associated Bellmark at the time the TMR and Tag Team Agreements were signed resolve the ownership question in favor of Isbell.  The admissible extrinsic evidence can only be interpreted as defining "Bellmark's affiliated publisher" and "Bellmark's affiliated designee publisher" as Isbell d/b/a Alvert Music. Under California law, when extrinsic evidence can only point to one conclusion, a court must rule as a matter of law.

Extrinsic evidence also establishes conclusively that Alvert Music was the owner of both musical compositions.  Under California law, contract interpretation remains a question of law even when extrinsic evidence has been admitted on the contract interpretation issue, so long as there are no material factual disputes as to "foundational extrinsic evidence."  *Parsons v. Bristol Dev. Co.*, 62 Cal. 2d 861, 865-66 (Cal. 1965); *Badie v. Bank of America*, 67 Cal. App. 4th 779, 799 (Cal. Ct. App. 1998).  Foundational extrinsic evidence refers to disputes over the historic facts – *i.e.*, disputes about "the credibility of extrinsic evidence," such as whether a particular letter was sent, or a particular statement made, during the contract negotiations. *Medical Operations Management, Inc. v. National Health Laboratories, Inc.*, 176 Cal. App. 3d 886, 891 (Cal. Ct. App. 1986).  Contract interpretation also remains a question of law if the only disputed extrinsic evidence is irrelevant or otherwise inadmissible.  *See Winet v. Price*, 4 Cal. App. 4th 1159, 1165-66, n.3 (Cal. Ct. App. 1992).  Finally, contract interpretation remains an issue of law even where disputes exist about the *inferences* to be drawn from uncontradicted extrinsic evidence:

> [I]t is only when conflicting inferences arise from conflicting evidence, not from uncontroverted evidence, that the trial court's resolution is binding.  The very possibility of . . . conflicting inferences, actually conflicting interpretations, far from relieving the . . . court of the responsibility of interpretation, signalizes the necessity of its assuming that responsibility.

*Medical Operations Management, Inc.,* 176 Cal. App. 3d at 891 (internal citations omitted); *see also Garcia v. Truck Insurance Exhange*, 36 Cal. 3d 426, 439 (Cal. 1984).

Any ambiguity in contracts must be interpreted to effectuate the parties intent at the time the contract was signed.  *See Banner Entertainment, Inc. v. Superior Court* 72 Cal. Rptr. 2d 598 (Cal. 1998).  "[T]he paramount consideration [in the interpretation of contracts] is the intention of the contracting parties '. . . as it existed at the time of contracting.'"  *Western Camps, Inc. v. Riverway Ranch Enterprises* 138 Cal. Rptr. 918, 923 (Cal. Ct. App. 1977); *see* Cal. Civ. Code, § 1636.  In this case, if this court finds the contracts' language ambiguous, all extrinsic evidence supports only one conclusion: Alvert Music is the owner of the compositions "Dazzey Duks" and "Whoomp (There It Is)," and neither Bellmark nor DM is.

### D. The Facts and Circustances Surrounding the Signing of the Contracts Shows an Intention to Benefit Alvertis Isbell d/b/a Alvert Music, a Completely Separate Entity from Bellmark.

The most reliable evidence, aside from the plain language of a contract, is the conduct of the parties after the execution of a contract, but before any controversy has arisen.  *Kennecott Corp. v. Union Oil Co.*, 242 Cal. Rptr. 403, 410 (Cal. Ct. App. 1987) (citing *United California Bank v. Maltzman*, 119 Cal. Rptr. 299 (Cal. Ct. App. 1974); *Spott Elec. Co. v. Indus. Indem., Co.*, 106 Cal. Rptr. 710 (Cal. Ct. App. 1973); *Salton Bay Marina, Inc. v. Imperial Irrigation Dist.*, 218 Cal. Rptr. 839 (Cal. Ct. App. 1985) (A court "is required to give 'great weight' to the conduct of the parties in interpreting the instrument before any controversy arose")).  The parties to the contracts treated Isbell as the owner of the Compositions before any controversy arose.  Isbell

registered "Whoomp! (There It Is)" with BMI through his d/b/a Alvert Music and no party ever questioned that registration.  *See* DE 153 pp. 18-19; *see also* Pl. Ex. 56.  This registration meant Isbell collected the public performance royalties for the "Whoomp! (There It Is)" composition. DE 153 pp. 18-19; *see e.g.* Pl. Ex. 109.

Within 60 days of the signing of the Tag Team Agreement, Alvert Music was indicating to third parties that Alvert Music owned the composition copyright to "Whoomp (There It Is)." Long before any hint of a dispute about ownership was raised, Bellmark treated Alvert Music as an entity separate from itself and as "Bellmark's affiliated designee publisher."  A Southern District of New York court found this writing:

> On May 20, 1993 Madeline Smith (who was clearly acting for both defendants [Bellmark and Alvert Music]) sent a 2-page fax [including a contract] to Ms. Bente [regarding "Whoomp (There It Is)"'s use of Emergency Music's song "I'm Ready" as part of its composition].  At the end of the May 20 agreement, the defendants told plaintiff's agent:
>
> > Your formal agreement should be issued to **Alvert Music obo itself** and Tag Team Music, c/o Bellmark Records, **ATTN: Al Bell**, 7060 Hollywood Blvd. #220, Hollywood, CA . . . .
>
> That formal agreement followed several weeks later . . . [i]t was signed by Ms. Bente on behalf of plaintiff and, as requested, she issued it to Alvert Music.

*Emergency Music*, No. 95 Civ 5182, 1998 U.S. Dist. LEXIS 8832, at *4 (emphasis added).  This clearly shows Bellmark was on notice of Alvert Music's actions and had no objection to them.

There is no evidence Bellmark ever entered into a single agreement to license the Compositions.  However, there is evidence that Isbell through his d/b/a did license the Compositions.  *See* DE 153 pp. 20-21; Pl. Ex. 19, 339, 340.  In fact, Isbell licensed the Compositions to DM, the very defendant in this case.  *See e.g.* Pl. Exs. 339, 340; *see also* DE 153-1 p. 211, lines 9-19.

Finally, the evidence indicates Alvert Music took the position it was the owner of the composition copyright for "Whoomp! (There It Is)" when that position was to Isbell's detriment. In June 1998, Bellmark was in Chapter VII bankruptcy.  Bellmark's bankruptcy stayed all litigation against it.  11 U.S.C. § 362.  The facts surrounding the bankruptcy meant that Isbell had lost his company, Bellmark, and could not have any liability or suffer any damage from actions taken against Bellmark.  At that same time, Emergency Music was suing both Isbell and Bellmark over liability for ownership of the composition copyright "Whoomp! (There It Is)." *Emergency Music*, No. 95 Civ 5182, 1998 U.S. Dist. LEXIS 8832 at *1.  If the composition copyright was owned by Bellmark, Isbell would have had no direct liability.  A person who does not own intellectual property cannot be liable for the non-owned property's infringement of another piece of intellectual property.  Further, if there was any doubt that Isbell owned the composition copyright he could have taken the position it was owned by Bellmark.[2]  Instead, Isbell admitted, the truth, he owned the composition copyright, and took a $632,766.47 judgment against himself personally. *Emergency Music*, No. 95 Civ 5182, 1998 U.S. Dist. LEXIS 8832 at *13.

A person does not claim ownership of property when that ownership means a huge financial burden.  Alvert Music consistently held itself out as the owner of the composition copyrights even when that position was expensive.  This is also illustrated by the fact that Isbell, under his own social security number paid taxes for the composition income which came to Alvert Music. *See* Pl. Ex. 3, 4.

There is no evidence in the record that anyone other than Alvert Music held itself out as the publisher of "Dazzey Duks" or "Whoomp (There It Is)."  Alvert Music has consistently taken

---

[2] There is testimony from Wallace Collins that he took contemporaneous notes of a conversation in which the bankruptcy trustee told him the composition "Whoomp! (There It is)" was not part of the bankruptcy estate. Deposition of Wallace Collins 26:7-27:11 and 35:18-36:10, attached hereto as Ex. A.

this position, dating back years before any dispute of ownership existed.  Bellmark was well aware of Alvert Music's actions and never objected to those actions.  No other party to the disputed contracts objected to Alvert Music's actions.  No one objected because Alvert Music owned the composition copyrights in question.  No one objected because Alvert Music's ownership of the composition copyrights in question effectuated the intent of the parties to the contracts.  The objective evidence shows this was the intention of the parties at the time the initial contracts were signed; the way the parties treated the contracts; the way Alvert Music understood the contracts; and, the way third parties viewed the ownership interest of the composition copyrights.

### E.  Alvertis Isbell is Alvert Music.

Isbell is Alvert Music.  Along with his brother, Paul, Isbell formed Alvert Music in 1977.  Pl. Ex. 228.  Alvert Music became solely the property of Ibell in 1993  Pl. Ex. 229.

There is overwhelming evidence that Isbell, individually, paid taxes on all Alvert Music's income.  Pl. Exs. 3, 4.  Isbell's tax returns have attached documents showing the accounting for this money and reflect 1099s which show payments from various companies to Alvert Music.  Pl. Exs. 3, 4.

When Alvert Music entered license agreements, those agreements required payments be made under Isbell's social security number.  *See e.g.*, Pl. Exs. 339, 340.  Further, as discussed above Isbell was subject to a large judgment against himself, personally, because Alvert Music was the owner of the composition "Whoomp! (There It Is)."  *See Emergency Music*, No. 95 Civ 5182, 1998 U.S. Dist. LEXIS 8832 at *13.

Every document shows Alvert Music licensing the compositions, "Dazzey Duks" and "Whoomp! (There It is)."  All of this licensing was done under Isbell's social security number.

Third parties paid Isbell for use of the compositions under his social security number and Isbell paid taxes on the income from Alvert Music.

## II.   DM's Argument Isbell is the Alter Ego of Bellmark is Barred as a Matter of Law.

DM's alter ego theory has no legal basis.  DM must be precluded from making an argument the Bellmark bankruptcy estate included Isbell's personal assets because Isbell was the Alter Ego of Bellmark.  Such an argument is wrong, legally barred, and designed only to cause jury confusion.

Plaintiff, Alvertis Isbell d/b/a Alvert Music moves this Court to exclude any "evidence" Isbell was the alter ego of Isbell Records, Inc. d/b/a Bellmark Records ("Bellmark") and any mention regarding this false alter ego theory.  Such evidence and argument are not supported as a matter of law and could only be offered to unfairly prejudice Isbell and confuse the jury.

"Alter ego" is a legal theory.  *See Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d 1106, 1130-33 (5th Cir. 1988) (explaining corporate disregard under Texas law).  "'The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interest.'" *Mid-Century Ins. Co. v. Gardner*, 11 Cal Rptr. 2d 918, 922 (Cal. Ct. App. 1992) (quoting *Mesler v. Bragg Management Co.*, 39 Cal. 3d 290, 300 (Cal. 1985)).  "It is the plaintiff's burden to overcome the presumption of the separate existence of the corporate entity."  *Id.*   The burden to prove alter ego is on the party seeking to retrieve assets from the alter ego.  *In re Multiponics, Inc.*, 622 F.2d 709, 723 (5th Cir. 1980).

DM's theory is that Isbell was the alter ego of Bellmark and as such DM bought Isbell's assets during the Bellmark bankruptcy sale.  This theory does not follow the law regarding alter ego.  Instead, DM is attempting to argue it practiced a "self-help" alter ego seizure and can now

17

come to Court after the fact and justify its actions through an alter ego theory.  The only proper use of alter ego is to bring suit, have a finding that an individual is an alter ego, and then be able to settle a judgment through that individual's assets.  A party cannot take an individual's assets and then later come to court seeking a finding that the unlawful and unauthorized taking was allowable based on an alter ego theory.  DM's alter ego theory is wrong as a matter of law and allowing jury argument on this issue is reversible error.

Further, DM failed to plead with particularity any alter ego defense.  Fed. R. Civ. P. 9(b).  Allegations of alter ego based on fraud must comply with Rule 9(b).[3]  *Ningbo Products Import & Export Co., Ltd., v. Eliau*, 2011 U.S. Dist. LEXIS 125789, at *16-17 (S.D.N.Y. Oct. 31, 2011); *see also Naftomar Shipping and Trading Co. Ltd. V. KMS Int'l S.A.*, No. V-11-2, 2011 U.S. Dist. LEXIS 24723, at *14-15 (S.D. Tex. March 10, 2011).  Failure to meet the pleading requirements of Rule 9(b) means DM's Alter Ego theory must be rejected.

There is no viable alter ego theory and the Court must not allow any argument regarding it.

### III.    As a Matter of Law Emergency Music Never Owned Any Portion of "Whoomp! (There It Is).

DM sought to amend its Answer to include a defense that it became a co-owner of "Whoomp! (There It Is)" by purchasing a portion of that composition from Emergency Music.  The Court denied that Motion.  DE 237.  As such, DM must be prohibited from making this argument at trial.

Further, Emergency Music never owned any portion of the composition "Whoomp!"  The Copyright Act, 17 U.S.C. § 201(a), provides that copyright ownership vests initially in the author

---

[3] Under Texas law, not all allegations of Alter Ego are necessarily based on fraud.  *River Capital Advisors of North Carolina, Inc. v. FCS Advisors, Inc.*, No. 4:10-cv-471, 2011 U.S. Dist. LEXIS 21335, at 20-21 (E.D. Tex. Feb. 7, 2011).

or authors of the work, and the author is generally the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection.  *Quintanilla v. Texas TV*, 139 F.3d 494, 496 (5th Cir. Tex. 1998).  Thus, authorship gives copyright ownership by operation of law.

The Act further provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).

DM's claim that Emergency Music owned a portion of the musical composition "Whoomp" fails because Emergency Music did not author "Whoomp! (There It Is)."  Further, DM cannot show a written transfer of ownership in "Whoomp! (There It Is)," to Emergency Music because such a transfer does not exist.  The only two ways to gain ownership in a copyright is by operation of law or by a written transfer.  In this case, neither exists, and, therefore, Emergency Music was never an owner of "Whoomp! (There It Is)" and that determination must be made as a matter of law.

**IV.    DM Cannot Establish Any Necessary Elements of Equitable Estoppel.**

DM has also attempted to assert an equitable estoppel defense.  In support of its argument, DM cites two cases which lay out the elements of equitable estoppel.

> [T]he doctrine of equitable estoppel requires: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations.

*Johnson & Higgins v. Kenneco Energy*, 962 S.W.2d 507, 515-516 (Tex. 1998) (overruled on other grounds) (citing *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex. 1991)).

In order to prevail on this theory, DM would have to show that Isbell made a false representation or concealed material facts that made DM believe it had purchased the compositions.   DM cannot point to any representation or omission which would have allowed DM to believe the compositions were part of the bankruptcy estate.   The bankruptcy petition itself lists Alvert Music as the owner of the compositions.   Def. Ex. 13.   Isbell has consistently held himself out as the owner of the compositions.   DM knew this starting in 1995 when DM licensed the compositions from Alvert Music.   Pl. Exs. 339, 340.   DM continued to act on this knowledge during the course of the bankruptcy when it licensed compositions from Alvert Music.   *See e.g.* Pl. Ex. 19.

There is no false representation.   However, even if there was a false representation there is certainly no indication the false representation was done "with the intention that it should be acted on."   For DM to prevail on this theory, Isbell would have had to lead the bankruptcy court to believe Bellmark's assets included the compositions with the intent that the bankruptcy court would assert control over the compositions and sell them.   Thus, Isbell would have had to have been involved in a scheme under which he would lose the benefit of the compositions without receiving any compensation.   There would be no benefit to such an intention and no explanation for the proposition Isbell wanted to give up the compositions for no compensation is possible.

Finally, even if DM could offer proof of any of the other elements its claim would still fail because DM was not "a party without knowledge or means of obtaining knowledge of the facts."   DM has repeatedly stated throughout this litigation that "Mark Watson, one of the owners of DM (a claimed former college professor of copyright law) and Karl Braun (a Nashville based lawyer with extensive music industry and copyright experience) conducted an exhaustive due diligence review of the records of Bellmark."   DE 138 ¶ 22.   DM did not rely on

any statement or omission by Isbell in falsely claiming ownership of the Compositions, instead DM relied on the incorrect findings of its "exhaustive due diligence."

DM cannot satisfy a single element required in order to bring an equitable estoppel defense.  Such a purported defense is wrong as a matter of law.

## Conclusion

Based on the foregoing, Isbell prays this Court will rule on the meaning of the contracts as a matter of law, and conclude that the assignment of the musical compositions "Dazzey Duks" and "Whoomp! (There It Is)" were not to Bellmark, but to a third party, Alvert Music, Bellmark's affiliated publisher.   To the extent necessary, the Court should also consider the evidence offered herein, all of which shows that Alvert Music is the publisher of "Dazzey Duks" and "Whoomp! (There It Is), and that the parties, including DM, all considered Alvert Music to be the publisher long before a dispute arose.  Further, Isbell prays the Court will  prohibit DM from arguing its alter ego theory, its theory that it is a co-owner of "Whoomp! (There It is)" through a purchase of Emergency Music's purported share of that composition, and its theory of equitable estoppel.

Respectfully submitted this 25th day of August, 2012.

/s/Richard S. Busch
Richard S. Busch, Tenn. No. 14594
Thomas J. Motzny, Tenn. No. 027737
Andrew W. Coffman, Tenn. No. 27160
KING & BALLOW
1100 Union Street Plaza
315 Union Street
Nashville, TN 37201
Telephone: (615) 259-3456
Facsimile: (615) 726-5417
Email: rbusch@kingballow.com

William S. Helfand
CHAMBERLAIN HRDLICKA WHITE

WILLIAMS & MARTIN
1200 Smith Street
Suite 1400
Houston, TX 77002
Telephone: (713) 654-9630
Facsimile: (713) 658-2553
Email: bill.helfand@chamberlainlaw.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

       I hereby certify that on the 25th day of August, 2012 I electronically filed the foregoing document with the Clerk of the Court using the ECF System which sent notification of such filing to the following:

Richard C. Wolfe, Esq.
WOLFE LAW MIAMI
175 SW 7th Street #2410
Miami, Florida 33130
Telephone: (305) 384-7370

Jo E. Hartwick
STUTZMAN, BROMBERG, ESSERMAN & PLIFKA
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 969-4900
Facsimile: (214) 969-4999

                                     /s/Andrew W. Coffman