**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

Alvertis Isbell d/b/a Alvert Music,

     Plaintiff,

v.

DM Records, Inc.,

     Defendant.

Case No. 4:07-cv-00146-RAS
(Judge Schell/Judge Bush)

---

**PLAINTIFF ALVERTIS ISBELL'S RULE 50 MOTION FOR JUDGMENT AS A
MATTER OF LAW**

---

Plaintiff Alvertis Isbell d/b/a Alvert Music submits this Motion and states as follows:

The undisputed evidence shows that Alvertis Isbell operated as a publisher and was the owner of musical compositions under the d/b/as Alvert Music (BMI) and Capitol Dome (ASCAP).  The evidence is undisputed that Alvertis Isbell was both Alvert Music and Capitol Dome and all payments to Alvert Music and Capitol Dome were made in Isbell's social security.  From 1989 until 1997, Isbell was the President of Isbell Records, Inc. d/b/a Bellmark Records ("Bellmark").  Bellmark was a corporation which owned sound recording copyrights.  The question before this Court is whether Bellmark owned certain composition copyrights based on the language of Agreements.  As a matter of law, Alvert, individually, is the owner of these compositions and DM has been engaged in copyright infringement since it began to exploit the compositions.

## STANDARD OF REVIEW

Judgment as a matter of law is proper when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a); *see also Brennan's, Inc. v. Dickie Brennan & Co.,* 376 F.3d 356, 362 (5th Cir. 2004).

I.    **The Plain Language of the Agreements Means the Issue of Contract Interpretation Must be Undertaken by The Court as a Matter of Law**

There are number of compositions at issue in this case.  Pl. Ex. 320.  The focus of the evidence has been on two songs, because those two songs generated the most revenue and the most paperwork.  The Court's determination regarding "Dazzey Duks" and "Whoomp! (There It Is)" will be dispositive of ownership of all the compositions as all the contractual language is substantially similar.

A. **California Law Applies to the Contract Dispute**

2

Alvert Music is the intended third-party beneficiary of both the TMR and Tag Team Agreements.  Both contracts state they are governed by California law.  Pl. 137, 146.

**B. The Plain Language of the TMR and Tag Team Agreements Demonstrate Alvert Music Owned the Composition Copyrights to "Dazzey Duks" and "Whoomp (There It Is)"**

Under California law, "[a] third party beneficiary may enforce a contract made for its benefit." *Hess v. Ford Motor Co.*, 41 P.3d 46, 51 (Cal. 2002) (citing Cal. Civ Code § 1635).  It is not necessary for a third party beneficiary to be specifically named in a contract.  *Galardi Group Franchise & Leasing LLC v. City of El Cajon*, 125 Cal. Rptr. 3d 394, 400 (Cal Ct. App. 2011) (citing *Neverkovec v. Fredricks*, 87 Cal. Rptr. 2d 856, 865 (Cal Ct. App. 1999)).

"'[A] putative third party's rights under a contract are predicated upon the contracting parties' intent to benefit' it." *Hess*, 41 P.3d at 51 (quoting *Garcia v. Truck Insurance Exchange*, 582 P.2d 1100 (Cal. 1984)).  Intent is determined using ordinary principles of contract interpretation.  *Id.*  Contracts must be interpreted "'to give effect to the mutual intention of the parties as it existed at the time of contracting.'"  *Id.* (quoting *Neverkovec*, 87 Cal. Rptr. 2d 856).  The parties' intentions should be determined by the writing itself; however, "'[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates.'"  *Id.* (quoting Cal. Civ. Code § 1647).  "When the interpretation of a contract does not turn upon the credibility of extrinsic evidence . . . interpretation is purely a judicial function to be exercised according to the generally accepted canons of interpretation.  *Martin Bros. Const., Inc. v. Thompson Pacific Const., Inc.*, No. C058944, 2009 Cal. App. LEXIS 1951, at *8 (Cal. Ct. App. Dec. 4, 2009).

There is no question that the contracts transferred the composition copyrights to "Bellmark's affiliated publishing company" and "Bellmark's affiliated designee publisher"

respectively.   As Alvertis Isbell d/b/a Alvert Music (BMI) and Capitol Dome (ASCAP) was

Bellmark's only affiliated publisher at the time, there is no question that the publishing was

transferred to Alvert.

1. **The Tag Team Agreement Clearly Transfers the Composition Copyright for "Whoomp (There It Is) to Alvert Music**

The March 30, 1993 "Exclusive Producers Agreement" between Tag Team and Bellmark

shows Bellmark's ability to refer to itself in a contract and its intention to transfer composition

copyrights to a third party.  Pl. Ex. 146.  The first mention of Bellmark in the contract is found in

its second paragraph, where it specifically defines Bellmark, "[t]his will also confirm the

agreement between you and Bellmark Records ('us', 'we', 'our' or 'Company') with respect to

your services as an arranger and record producer."  Pl. Ex. 146.  Bellmark is defined as "us, we,

our, or Company."   When dealing with composition copyrights, the Agreement never uses the

terms "us," "we," "our," or "Company."

When this contract granted Bellmark the master recording made under its terms, it states "we

shall own in perpetuity, throughout the universe, all rights of every kind and character in the

musical materials and results and proceeds of your services rendered hereunder and, all works

including the Masters, prepared hereunder shall be considered as Works (including the Masters)

made for hire on our behalf."  Pl. Ex. 146.  The contract also deals with master recording

copyrights created by "accepted artists" stating: "[d]uring the term, you shall exclusively offer to

Company all masters which are available for distribution in the Territory."  Pl. Ex. 146 at 2.

The contract uses different terms when it deals with the composition copyrights.

Paragraph 18(e)"ASSIGNMENT OF COMPOSITION AND RIGHTS TO COPYRIGHT."  Pl.

Ex. 146 at Ex. B.  Instead of granting these rights to "Bellmark," "we," "us," or "Company," the

contract states:

> For good and valuable considerations, the receipt of which is hereby acknowledged, you hereby assign, transfer, convey and sell fifty percent (50%) interest in and to publisher's share of each Controlled Composition defined in paragraph 18 above, and each Composition pursuant to the terms and conditions of Exhibit 'B' attached hereto and incorporated herein.

Pl. Ex. 146.  The absence of any assignment to Bellmark is glaring in its omission.

This provision of the agreement never uses the terms Bellmark, we, us, or Company, instead it refers to Exhibit B attached to the Agreement.  Instead of granting these rights to Bellmark, we, us, or Company, Exhibit B of the contract states:

> [T]he undersigned Assignors do hereby sell, assign, transfer and set over unto **Bellmark's affiliated designee publisher**, it successors and assigns, fifty percent (50%) of the entire rights, title and interests throughout the world and universe, including without limitation, the copyrights and any registration and copyright applications relating thereto, and any and all renewals and extension thereof and in and to all works based upon, derived from, or incorporating the work covered by such copyrights, and in and to all income, royalties, damages, claims and payments now or hereafter due.

Pl. Ex. 146, Ex. B (emphasis added).  This is wholly different from the way Exhibit C to the agreement transfers the *master* to "Bellmark."  Pl. Ex. 146, Ex. C.  The difference in the language of the contract indicates that the composition copyrights were not assigned to Bellmark, but instead were granted to a third party, Bellmark's affiliated designee publisher.

"A fundamental rule of construction is that a court must give effect to every word or term employed by the parties and reject none as meaningless or surplusage in arriving at the intention of the contracting parties."  *United States v. Hathaway*, 242 F.2d 897, 900 (9th Cir. 1957); *see also Khouw v. Methodist Hospitals of Dallas*, 126 Fed. Appx. 657, 659 (5th Cir. 2005).  The Fifth Circuit held exactly this in deciding another matter in this case. *Isbell v. DM Records, Inc.*, 586 F.3d 334, 337 (5th Cir. 2009) ("[A] contract should be interpreted as to give meaning to all of its terms--presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.").  When rights are granted to Bellmark, the contract says

Bellmark; when rights are granted to a third party, the contract says "Bellmark's affiliated designee publisher." The parties used two different terms to refer to two different entities receiving rights and the intentions of the parties must be followed.

This is further evidenced by the "GRANT OF POWER OF ATTORNEY" contained within the contract. Pl. Ex. 146. That provision of the contract states:

> You and Accepted Artists and Writers . . . hereby irrevocably and coupled with an interest, constitute, authorize, empower and appoint **Company and its affiliated designee publisher** or any of their agents and officers your, Accepted Artists' and Writers' true and lawful attorneys . . . to take and do such action, and to make, sign, execute, acknowledge and deliver any and all instruments and/or documents, which **Company and/or it's [sic] affiliated designee publisher** from time to time may deem desirable or necessary to effectuate the intents and purposes of the 'Grant of Rights' and 'Sale and Assignment of Masters' and 'Mechanical Copyrights; Controlled Compositions' provisions hereof and to accomplish, evidence and to perfect the rights granted to **Company and it's [sic] affiliated designee publisher** to vest in **Company, its successors and assigns and Company's affiliated designee publisher, its successor and assigns**, exclusively, perpetually and throughout the world and universe, all the rights, title and interests granted by you . . . under this Agreement.

Pl. Ex. 146 at 14 (emphasis added). If Bellmark was the same entity as its "affiliated designee publisher" or owned its "affiliated designee publisher" the power of attorney would need only to be granted to Bellmark. This language clearly and unambiguously shows the two to be separate.

Further, the existence of this Controlled Composition language shows Bellmark was not the owner of the musical composition rights, as an owner does not need a license to exploit a copyright. *See Quintanilla v. Texas Television, Inc.*, 139 F.3d 494, 498 (5th Cir. 1998). The contract contains no license for the masters.

## 2. The TMR Agreement's Plain Language Means Alvert Music Owns the Composition Copyright for "Dazzey Duks"

Exhibit 137 (the "TMR contract") contains a number of references to Bellmark. Page 1 of the contract states, "Bellmark agrees to provide you manufacturing, world-wide distribution,

marketing services and/or selling of records of "Duice." Pl. Ex. 137.  The contract contains

numerous other references to "Bellmark" and two references to "Isbell Records, Inc."  When

Bellmark had a right or obligation under the terms of the contract, the contract used the terms

"Bellmark," "Isbell Records, Inc.," "us," or "we."  When the contract gave an entity the

copyright composition "Dazzey Duks," however, it did not use the terms "Bellmark," "Isbell

Records, Inc.," "us," or "we."  Instead the contract then used the term "Bellmark's affiliated

publishing company."  Pl. Ex. 137.  The Controlled Compositions provision of the agreement

states:

> The copyright of the Controlled Composition entitled "Dazzey Duks" will be divided equally between your affiliated publishing company yet to be formed, Gigolo Chez Publishing and Bellmark's affiliated publishing company (1/3) share each) and shall be administered by Bellmark publishing company or designee. The copyrights of all other Controlled Compositions of songs released through this Co-venture will be divided equally between your affiliated publishing company and Bellmark's affiliated publishing company and shall be administer by Bellmark's publishing company or designee.

Ex. 137.

There is no dispute that DM Records bought an ownership in certain masters owned by

Bellmark because the TMR Agreement states "[y]ou agree to assign and transfer to us an

undivided one-half (1/2) interest of your right, title and interest in all master recording you make,

record or produce which Bellmark/Life accepts."  Pl. Ex. 137.

When the contract deals with composition copyrights, Bellmark did not state it had an

interest.  Instead, that interest was given to "Bellmark's affiliated publishing company."  Pl. Ex.

137.  This language transfers the composition copyrights, not to Bellmark, but to a third party.

Mark Watson the President of DM Records has admitted Alvert Music was Bellmark's

affiliated publisher.  The plain language in the TMR and Tag Team Agreements that the

composition copyrights were transferred to a third party publishing company combined with the

historical fact that Isbell d/b/a Alvert Music was Bellmark's affiliated publishing company at the time the agreements were signed resolves the ownership question in favor of Alvert.

## C.  As a Matter of Law the Parties to the Contracts Intended to Benefit Alvert Music

Extrinsic evidence also establishes conclusively that Alvert Music was the owner of both musical compositions.  Under California law, contract interpretation remains a question of law even when extrinsic evidence has been admitted on the contract interpretation issue, so long as there are no material factual disputes as to "foundational extrinsic evidence." *Badie v. Bank of America*, 67 Cal. App. 4th 779, 799 (Cal. Ct. App. 1998).  Foundational extrinsic evidence refers to disputes over the historic facts – *i.e.*, disputes about "the credibility of extrinsic evidence," such as whether a particular letter was sent, or a particular statement made, during the contract negotiations. *Medical Operations Mgmt, Inc. v. National Health Labs., Inc.*, 176 Cal. App. 3d 886, 891 (Cal. Ct. App. 1986).  Contract interpretation also remains a question of law if the only disputed extrinsic evidence is irrelevant or otherwise inadmissible.  *See Winet v. Price*, 4 Cal. App. 4th 1159, 1165-66, n.3 (Cal. Ct. App. 1992).  Finally, contract interpretation remains an issue of law even where disputes exist about the *inferences* to be drawn from uncontradicted extrinsic evidence. *Medical Operations Mgmt, Inc.,* 176 Cal. App. 3d at 891; *see also Garcia v. Truck Ins. Exchange*, 36 Cal. 3d 426, 439 (Cal. 1984).

**Any ambiguity in contracts must be interpreted to effectuate the parties' intent at the time the contract was signed**. *See Banner Entmt., Inc. v. Superior Court* 72 Cal. Rptr. 2d 598 (Cal. 1998) (emphasis added).  **"[T]he paramount consideration [in the interpretation of contracts] is the intention of the contracting parties '. . . as it existed at the time of contracting.'"** *Western Camps, Inc. v. Riverway Ranch Enterprises* 138 Cal. Rptr. 918, 923 (Cal. Ct. App. 1977) (emphasis added); *see* Cal. Civ. Code, § 1636.

Isbell signed both Agreements on behalf of Bellmark.  He is the only party to the Agreements to give any testimony regarding the intent of the parties at the time of contracting. Isbell's unrebutted testimony is that both Bellmark and the parties contracting with Bellmark intended the Agreements to benefit Alvert Music.  *See Garcia*, Cal. 3d at 439 n.7 (agents for parties to a contract may give testimony regarding the intention of the parties to a contract). Courts have routinely held that where there is no dispute between the parties to a transfer, a third party infringer cannot challenge that transfer.  *See KB Homes v. Antares Homes, Ltd*, No. 3:04-cv-1031, 2007 U.S. Dist. LEXIS 47273 (N.D. Tex. June 28, 2007); *see also Jules Jordan Video, Inc. v. 144942 Canada Inc*., 617 F.3d 1146, 1157 (9th Cir. 2010); *Imperial Residential Design v. Palms Dev. Group*, 70 F.3d 96, 99 (11th Cir. 1995).  Here, there is no dispute between the parties to the Agreement, and DM has no standing to challenge the unrebutted testimony on this point.

**D. The Facts and Circumstances Surrounding the Signing of the Contracts Shows an Intention to Benefit Alvert Music, a Completely Separate Entity from Bellmark**

The foregoing should end the inquiry as judgment should be entered in favor of Alvert. If the court goes further it may also consider the conduct of the parties after the execution of a contract, but before any controversy has arisen.  *Kennecott Corp. v. Union Oil Co.*, 242 Cal. Rptr. 403, 410 (Cal. Ct. App. 1987) (citing *United California Bank v. Maltzman*, 119 Cal. Rptr. 299 (Cal. Ct. App. 1974); *Spott Elec. Co. v. Indus. Indem., Co.*, 106 Cal. Rptr. 710 (Cal. Ct. App. 1973); *Salton Bay Marina, Inc. v. Imperial Irrigation Dist.*, 218 Cal. Rptr. 839 (Cal. Ct. App. 1985).

The parties to the contracts treated Alvert as the owner of the Compositions before any controversy arose.  Alvert registered "Whoomp (There It Is)" with BMI through his d/b/a Alvert Music and none of the parties to the Tag Team Agreement never questioned that registration. *See* Pl. Ex. 56.

9

Bellmark, itself, held Alvert Music out as the publisher of the composition "Whoomp! (There It Is)." A Southern District of New York court made exactly this finding, writing:

On May 20, 1993 Madeline Smith (who was clearly acting for both defendants [Bellmark and Alvert Music]) sent a 2-page fax [including a contract] to Ms. Bente [regarding "Whoomp (There It Is)"'s use of Emergency Music's song "I'm Ready" as part of its composition]. At the end of the May 20 agreement, the defendants told plaintiff's agent:

Your formal agreement should be issued to Alvert Music obo itself and Tag Team Music, c/o Bellmark Records, ATTN: Al Bell, 7060 Hollywood Blvd. #220, Hollywood, CA . . . .

That formal agreement followed several weeks later . . . [i]t was signed by Ms. Bente on behalf of plaintiff and, as requested, she issued it to Alvert Music.

*Emergency Music*, No. 95 Civ 5182, 1998 U.S. Dist. LEXIS 8832, at *4; *See also* 233. This clearly shows Bellmark was on notice of Alvert Music's actions and had no objection to them.

DM has presented no evidence Bellmark ever entered into a single agreement to license the Compositions. Alvert licensed the Compositions repeatedly, including to DM, the very defendant in this case. *See e.g.* Pl. Exs. 19, 339, 340; *see also* Pls. Ex. 233 (Emergency Music opinion) at 9 (referencing 33 composition synchronization licenses to parties such as CBS, Inc.; Fox TV, Paramount Pictures and Walt Disney).

Two years before Bellmark's bankruptcy, DM put out an album *Trunk Funk*, which contains both the master recordings and the compositions of "Whoomp (There It Is)" and "Dazzey Duks." Pl. Ex. 256. *Trunk Funk* lists Alvert Music as publishing the Compositions. Pl. Ex. 256. This listing of Alvert Music as the publisher of the Compositions is exactly the way in which all third parties treated Alvert as the owner of the Compositions. *See* Pl. Exs. 25, 60, 134, 135, 71, 81, 91, 99 (Third parties licensing compositions from Alvert Music).

The evidence also indicates Alvert Music took the position it was the owner of the composition copyright for "Whoomp! (There It Is)" when that position was to Alvert's financial

detriment.   The facts surrounding the bankruptcy meant that Alvert had lost his company,

Bellmark, and could not have any liability or suffer any damage from actions taken against

Bellmark.   At that same time, Emergency Music was suing both Alvert and Bellmark over

liability for ownership of the composition copyright "Whoomp! (There It Is)."   *Emergency

Music*, No. 95 Civ 5182, 1998 U.S. Dist. LEXIS 8832 at *1; *See* Pl. Ex. 233.   If the composition

copyright was owned by Bellmark, Alvert would have had no liability.   Alvert admitted the truth,

he owned the composition copyright, and took a $632,766.47 judgment against himself

personally. *Id.* at *13.   Further, there is unrebutted testimony from Wallace Collins that Alvert

actually paid $300,000 to Emergency Music to settle the suit.   *See also* Pl. Ex. 237.   The Court

also remarked about the 33 licenses entered by Alvert.   Pl. Ex. 233 at 9.

Alvert is listed as a creditor in the Bellmark bankruptcy, Pl. Ex. 342; Def. Ex. 13, and is

listed as the owner of compositions, including "Dazzey Duks" and "Whoomp! (There It Is)" on

schedule 1 of the bankruptcy petition.   Pl. Ex. 342; Def. Ex. 13.   Wallace Collins testified the

bankruptcy trustee told him the compositions were not included in the bankruptcy estate.   *See* Pl.

Ex. 338.   Gary Roth testified the bankruptcy trustee never attempted to collect Alvert Music

income from BMI.   Additionally, the bankruptcy trustee never entered a mechanical license.

Alvert is listed as the publisher of Tag Team compositions on a Bellmark released Compact

Disc. Pl. Ex. 143.   Additionally, Alvert filed a recordation in the copyright office listing himself

as the owner of the compositions.   Pl. Ex. 213.   Every single mechanical license in evidence lists

Alvert as the publisher of the compositions.   *See* Pl. Exs. 25, 60, 134, 135, 71, 81, 91, 99.

Multiple copyright registrations were filed listing Alvert Music as the owner of other Tag Team

compositions.   Pl. Ex. 56.

At best, DM can point only point to additional actions Alvert Music *could have* with its ownership interest, e.g. registering the copyrights in Alvert's name.  However, DM lacks any evidence that *Bellmark* took any of these actions in order to claim an ownership interest, which is irrelevant.  This lack of evidence is fatal to DM's claims.

### E.  Other Compositions

While this motion deals primarily with "Whoomp" and "Dazzey Duks," this lawsuit seeks recovery of all compositions claimed by DM Records through the purchase of the Bellmark records bankruptcy estate.  The unrebutted testimony of Mr. Isbell is that in no agreement Bellmark entered into was intended to transfer composition copyrights to Bellmark.  Instead, as was the case with "Whoomp" and "Dazzey," those agreements transfer the publishing to Bellmark's affiliated publishing company.  *See*, e.g., Pls Exs. 138, 139, 140, 141 and 151.  DM has not produced a single document to rebut this fact.  The Court should, thus, resolve the identity of Bellmark's affiliated publisher as a matter of law in these agreements as well.

### II.      As a Matter of Law, Emergency Music Never Owned Any Portion of "Whoomp! (There It Is)"

Emergency Music never owned any portion of the composition "Whoomp! (There It Is)."

The Copyright Act, 17 U.S.C. § 201(a), provides that copyright ownership vests initially in the author or authors of the work, and the author is generally the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection.  *Quintanilla v. Texas TV*, 139 F.3d 494, 496 (5th Cir.1998).  The Act further provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).

Emergency Music's own attorney, Wallace Collins, testified Emergency Music never owned any portion of "Whoomp! (There It Is)." *See also* Pl. Ex. 57. Mark Watson admitted DM's attorney Karl Braun testified that Emergency Music never owned "Whoomp! (There It Is)." DM also took this position in dealing with third parties. Pl. Ex. 243. Additionally, Emergency Music sued Alvert for copyright infringement in regard to his ownership of "Whoomp! (There It Is)." Co-owners cannot sue each other for infringement. *Quintanilla*, 139 F.3d at 500 (5th Cir. 1998). Thus, as a matter of law Emergency Music cannot have owned a portion of "Whoomp! (There It Is)." Further, Emergency Music never claimed to own "Whoomp! (There It Is)," instead Emergency Music entered a license agreement with Bellmark and Alvert for use of the Emergency Music composition "I'm Ready." Pl. Ex. 336, 337. Emergency Music cancelled that license in 1994 and never had any right to royalties after that point. Pl. Ex. 234; *see also* Pl. Ex. 233.

### III. DM Cannot prove any of the Elements of Equitable Estoppel

DM has also attempted to assert an equitable estoppel/waiver defense. Equitable estoppels or waiver require a defendant to prove:

> (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations.

*Johnson & Higgins v. Kenneco Energy*, 962 S.W.2d 507, 515-16 (Tex. 1998) (overruled on other grounds) (citing *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex. 1991)).

There is no evidence Alvert made a false representation or concealed any material fact. In fact, all the evidence shows that Alvert has been consistently holding himself out as the owner of "Whoomp! (There It Is)," "Dazzey Duks," and every other composition at issue since the initial transfer of those compositions. There is evidence Alvert licensed the compositions to DM

13

before Bellmark's bankruptcy, Pl. Exs. 339, 340, and during Bellmark's bankruptcy, Pl. Ex. 19. Alvert Music, not Bellmark, registered the compositions with BMI.  Pl. Ex. 56.  Further, when Bellmark went into bankruptcy, Alvert was listed as a creditor and as the holder of certain mechanical licenses with Bellmark.   Pl. Ex. 342; Def. Ex. 13.   During the course of the bankruptcy, Alvert gave a deposition in which he claimed ownership of the compositions.  Pl. Ex. 329.

Alvert never made any statement that he was not the owner of the compositions.  He never tried to hide his ownership interest.  Certainly, he did not do so in such a way that DM could have relied on any purported statement or concealment to its detriment.  In fact, Mark Watson testified that DM relied on his due diligence and not on statements made by Alvert.

## IV.    DM Has Infringed on Alvert's Compositions as a Matter of Law

Having established ownership of the composition copyrights, Alvert is entitled to infringement damages.[1]   In order to prove copyright infringement a party must prove two elements (1) ownership; and (2) a violation of the owner's exclusive rights under Title 17 sections 106 through 122 of the United States Code.  *See Controversy Music v. Down Under Pub Tyler, Inc.*, 488 F. Supp. 2d 572, 576 (E.D. Tex. 2007).  Included in these protected rights, are the right to reproduce works, to distribute copies of works, to publicly perform works, license works, and otherwise exploit one's intellectual property.  17 U.S.C. 106.

The unrebutted testimony is that DM collected the public performance money from the exploitation of composition copyrights.  A Court in this district has specifically held that one who had the ability to control public performance and a financial stake in that public performance is liable for copyright infringement.  *Controversy Music*, 488 F. Supp. 2d at 577.

---

[1] DM has raised an affirmative defense that it is a co-owner of "Dazzey Duks."  However, the evidence shows DM did not become a co-owner until 2003.  Def. Ex. 45.  DM's late co-ownership cannot excuse its infringement before the date of the 2003 assignment.

Additionally, there is evidence that DM licensed the composition "Whoomp! There It Is" as if it was the owner.  See Pl. Exs. 262-312.  This is also copyright infringement.

### V.       No Reasonable Jury Could Reject Alvert's Damages Expert

Gary Cohen, a damages expert, testified in regard to damages on behalf of Alvert. Other than the *ipse dixit* statements of David Watson, DM put on no evidence to rebut Cohen's testimony.  Since DM did not proffer any evidence by which a reasonable jury could find for the defendants, this Court should enter judgment as a matter of law based on Cohen's damages estimate.  Pls. Ex. 335.

Respectfully submitted this 6th day of September, 2012.

<div style="margin-left:50%">

/s/Richard s. Busch
Richard S. Busch, Tenn. No. 14594
Thomas J. Motzny, Tenn. No. 27737
Andrew W. Coffman, Tenn. No. 27160
KING & BALLOW
1100 Union Street Plaza
315 Union Street
Nashville, TN 37201
Telephone: (615) 259-3456
Facsimile: (615) 726-5417
Email: rbusch@kingballow.com

William S. Helfand
CHAMBERLAIN HRDLICKA WHITE
WILLIAMS & MARTIN
1200 Smith Street
Suite 1400
Houston, TX 77002
Telephone: (713) 654-9630
Facsimile: (713) 658-2553
Email: bill.helfand@chamberlainlaw.com
*Attorneys for Plaintiff*

</div>

## CERTIFICATE OF CONFERENCE

This motion was hand delivered to the Court and opposing counsel on September 6, 2012 and on September 7, 2012 was argued live before Judge Schell on September 7, 2012.  DM opposes the relief requested herein.

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of September, 2012 I filed the foregoing document with the Court's CM/ECF system, which served notice on the following:

Richard C. Wolfe, Esq.

/s/Thomas J. Motzny